**Clinton E. JENCKS, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 15157.**

United States Court of Appeals
Fifth Circuit.

Oct. 26, 1955.

Rehearing Denied Dec. 1, 1955.

E. B. Elfers, El Paso, Tex., John T. McTernan, Los Angeles, Cal., for appellant.

Holvey Williams, Asst. U. S. Atty., El Paso, Tex., Russell B. Wine, U. S. Atty., San Antonio, Tex., Brandon Alvey, Atty., Dept. of Justice, Washington, D. C., for appellee.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

CAMERON, Circuit Judge.

Appellant was convicted of violating Title 18 U.S.C.A. § 1001 by making false statements to National Labor Relations Board, a government agency. The indictment was in two counts, charging that, on April 28, 1950, he executed N.L.R.B. Form 1081 pursuant to Section 159(h), Title 29 U.S.C.A., same being the Non-Communist Affidavit of a Union Officer. Count One charged that appellant falsely stated in the affidavit that he was not then a member of the Communist Party, and Count Two that he was not then affiliated with the Communist Party. The jury returned a verdict of guilty on both counts, and he was sentenced to imprisonment for five years on each count, the sentences to run concurrently.

Appellant introduced no witnesses, but assigns a large number of errors of the court below, raising chiefly these questions: whether the evidence was sufficient to establish that appellant caused the affidavit to be filed, and that he was a member of or affiliated with the Communist Party at that time; whether evidence was wrongfully admitted of the filing by appellant of an affidavit six months before the one on which he was prosecuted; and whether the court erred in refusing a bill of particulars and in refusing appellant's request for inspection of certain F.B.I. records, or in failing to caution the jury concerning credibility of informers.

The facts as established by the jury verdict are set forth in the succeeding paragraphs. On April 28, 1950 appellant signed an affidavit on N.L.R.B. Form 1081 entitled, "Affidavit of Non-Communist Union Officer", and swore to it before a notary public, which stated that he was a responsible officer of the union known as Amalgamated Bayard District Union of Mine, Mill, and Smelter Workers, Local 890, International Union of Mine, Mill and Smelter Workers and was not a Communist at the time. This affidavit was received in due course of mail at the Regional Office of the National Labor Relations Board in El Paso, Texas, on May 1st, accompanied by an undated letter signed by appellant as President of that local union and on its letterhead, stating that he would fill out and return the requisite Labor Organization Registration Form if a copy should be forwarded to him. Under the practices in force, the Board would not extend its facilities to any union not complying with the requirements of the Taft-Hartley Law, which required that the Non-Communist Affidavit be filed. May 2nd, the Regional Office of N.L.R.B. mailed appellant an acknowledgment of his affidavit (which appellant received) and stated that his union would be considered as in compliance with the filing requirements of the law.

The El Paso Regional Office had also received in due course of mail prior documents signed by appellant tending to establish a symmetrical course of dealing obedient to the terms of the Taft-Hartley Law. Among these were a financial report dated December 31, 1948, a certified list of union officers dated October 15, 1949, showing appellant to be president of the union; a Non-Communist Affidavit dated October 15, 1949 identical with that of April 28, 1950 upon which appellant was prosecuted; a certificate dated January 13, 1950 declaring that appellant intended, within ninety days, to re-file with N.L.R.B. financial data required by the Taft-Hartley Law; a financial report dated March 30, 1950; a certificate setting forth the names of the officers of the union of which appellant was president bearing date of April 27, 1950, and a letter of the same date requesting that appellant be sent a certain Taft-Hartley form.

Each of these documents was signed by appellant, was stamped with the rubber stamp of the Regional Office showing date of receipt, and was a part of the Government files. The Regional Office mailed appellant a letter dated May 2, 1950 acknowledging the foregoing letter of April 27th, and sent appellant a Government form requested by him and giving certain instructions including the direction that reigstration information must be filed annually.

Subsequent to the April 28, 1950 affidavit upon which the prosecution was based, the Regional Office received, in due course of mail, a complaint upon the regular form provided by N.L.R.B. bearing appellant's signature, and setting forth a charge by appellant's union against one of the employers having a contract with appellant's union. This complaint could be recognized and handled by N.L.R.B. only after due filing of a Non-Communist Affidavit covering the year in which it was filed.

Plaintiff published in a paper put out by his local union in October, 1949 a statement, over the names of himself as President and the other local union officers, headed, "What The Next C.I.O. Convention Means To Our Union". This stated that appellant's union had suffered greatly from attacks of other unions under the Taft-Hartley Act, and that President Murray had threatened to expel appellant's union, among others, and stated, "Now that our Union has signed the phony affidavits we can defend ourselves on a ballot in case of raids. We do not fear attack from that quarter any longer." Prior to the filing of the October, 1949 affidavit referred to in the foregoing newspaper article, appellant's union had followed the policy of refusing to file the Non-Communist Affidavits.

Appellant's connection with the Communist Party was established by the evidence as beginning with April, 1946, at which time he was Chairman of the Denver, Colorado Chapter of American Veterans Committee. He attended a Communist Party meeting at the home of the Colorado Chairman of the Party and urged that there were too many Communist Party members in the Committee of which he was Chairman, and that members should spread themselves into other veterans' organizations. Appellant was employed by the International Union of Mine, Mill and Smelter Workers in connection with the local unions at Silver City and Bayard, New Mexico in 1946, at which time he was identified as a dues-paying Communist Party member. He attended closed Communist Party meetings in 1947 and was appointed member of a committee to bring Mexican-Americans into the Communist Party.

He attended Communist Party meetings in 1948, and also meetings at which was determined strategy of elements of labor unions under fire for Communist activities. It was decided that the Non-Communist Affidavits required by the Taft-Hartley Act should not be signed. In August, 1947 appellant attended a meeting of the Communist Party Steering Committee and participated in discussing ways and means by which appellant's union could be used to carry out policies of the Communist Party. In August, 1948 appellant attended a meeting of Communists at the home of the New Mexico Chairman, at which appellant outlined his plans as a candidate for Congress on the Progressive Party ticket. Early in 1949 appellant was appointed head of the Southern Section of the Communist Party in New Mexico, and at a Communist Party meeting in April, 1949 appellant was designated as the head of the Communist Party Labor activities. Appellant accepted the designation and stated that he would use his energies to insure labor support, including greater financial support, to the Communist Party.

In May, 1949 he attended a Communist Party meeting in the home of its leader in New Mexico, reporting that he was having success in recruiting Communist Party members from the ranks of Labor, and promised that his union

newspaper would support causes of concern to the Communist Party. He identified as his assistant in this work the notary who took both his affidavits as a Non-Communist Union Officer. At a meeting of the Communist Party in 1949, appellant and others made plans for the forthcoming meeting of the Mexican-American Association in Albuquerque, New Mexico, and all present were given specific responsibilities in connection with that meeting.

At this meeting in August, 1949, a resolution was defeated which called upon the Mexican-American Association (frequently referred to as ANMA) to disavow Communist support and to condemn any organization that advocated the violent overthrow of the United States Government. Appellant was present at the meeting and his wife led the opposition to this resolution.

It was the policy of Communist Party officers and members not to carry membership cards during 1949 and 1950. Appellant was a member of the State Board of the Communist Party of New Mexico, and the Security Officer of the Party knew of no disciplinary action taken against appellant during 1949 or 1950 or any action to remove appellant as a member of the State Board.

During 1950, 1951 and 1952 appellant urged the members of his union to read the Daily Peoples World, a Communist newspaper, appellant stating that this paper brought the truth and that other newspapers were controlled by Capitalists. Sometime after July, 1950 appellant told a member of his union, afterwards expelled for his bold Non-Communist stand, that he had signed the Non-Communist Affidavit in 1950. In July, 1950 and at subsequent dates, appellant made statements to Harvey Matusow, a member of the Communist Party, connecting appellant with activities of the Communist Party, particularly among the Mexican-Americans and the members of the union of which appellant was president.

Appellant offered no evidence except a few documents, chief among which were appellant's honorable discharge from the United States Air Force and several citations for bravery and awards of medals for unusual displays of skill and courage in action in the Pacific theater of war. The record of more than one thousand pages contains the evidence of only nine witnesses introduced by the Government, together with the documentary evidence accompanying their testimony. A good portion of the record is taken up by a large number of motions filed by appellant at various stages of the trial and the extensive objections made by him to the testimony as it was being introduced. A great many of these objections are assigned in appellant's Specification of Error, but are not included in the ten points argued by appellant.

We will group those ten points further and discuss them under the general headings: Whether there was sufficient evidence that appellant caused the affidavit mentioned in the indictment to be filed, whether the evidence was sufficient to show that appellant knew that he was, on the date of that affidavit, a member of or affiliated with the Communist Party, and whether those issues were properly submitted to the jury by the court's charge, whether evidence concerning the filing of the Non-Communist Affidavit of October 15, 1949 was erroneously admitted and whether appellant was prejudiced thereby; and whether the court below committed procedural errors prejudicial to appellant in connection with its rejection of appellant's efforts to force the Government to give him particulars of its contemplated proof, in connection with appellant's efforts to inspect statements of certain witnesses, and other procedural errors relied on by appellant.

(1) Appellant was convicted of violating 18 U.S.C.A. § 1001 [1] which is incor-

---

4. *"Statements or entries generally*
 "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations,

porated by reference in the Taft-Hartley Act, 29 U.S.C.A. § 159(h).[2] The basis of the prosecution was an affidavit the Government charges the appellant signed on April 28, 1950, and caused to be filed with the proper office of the National Labor Relations Board.[3] The first point made by appellant is that the evidence fails to show that he caused this affidavit to be filed. He does not argue that he did not sign the affidavit, and the proof is without dispute that he did sign it.

 The essence of the offense charged by the Government is the filing of the affidavit and the burden rested on it to prove that appellant filed the affidavit or caused it to be filed. The Government amply sustained that burden, the circumstances showing clearly that appellant caused it to be filed. A review of a few of those circumstances will demonstrate this.

Appellant was the president and chief moving force of his union, and his was the duty of taking the steps necessary to comply with Taft-Hartley if the union decided to avail itself of the benefits of that Act. Initially appellant had led the union in a policy of non-compliance. The result was that complying unions were making heavy raids upon the membership of his union, and the higher un-

---

or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. "(h) No investigation shall be made by the Board of any question affecting commerce concerning the representation of employees, raised by a labor organization under subsection (c) of this section, and no complaint shall be issued pursuant to a charge made by a labor organization under subsection (b) of section 160 of this title, unless there is on file with the Board an affidavit executed contemporaneously or within the preceding twelve-month period by each officer of such labor organization and the officers of any national or international labor organization of which it is an affiliate or constituent unit that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods. The provisions of sections 286, 287, 1001, 1022, and 1023 of Title 18 shall be applicable in respect to such affidavits."

3. "Form NLRB–1081
 United States of America
 National Labor Relations Board
 Affidavit of Noncommunist Union Officer
 (See Instructions on reverse)
 The undersigned, being duly sworn, deposes and says:
 1. I am a responsible officer of the union named below.
 2. I am not a member of the Communist Party or affiliated with such party.

3. I do not believe in, and I am not a member of nor do I support any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods.

Amalgamated Bayard District Union of Mine, Mill & Smelter Workers Local 890 International Union of Mine, Mill and Smelter Workers

---

(Full name of national or international union of which it is an affiliate or constituent unit)

 Signature Clinton E. Jencks
 Address Box 98
 (Street)
 Bayard, New Mexico
 (City and State)

(The notary public or other person authorized by law to administer oaths must fill in completely all blank spaces below.)
Subscribed and sworn to before me this 28th day of April, 1950
A notary public or other person authorized by law to administer oaths in and for the county of Grant, State of New Mexico
My commission expires March 17, 1952

 Arthur Flores
 (Signature)
[Seal]

---

Warning.—The attention of persons filing this form with the Board is directed to Section 35(A) of the criminal code, which provides that any person willfully making or causing to be made any false or fraudulent statements or representations in any matter within the jurisdiction of the Board shall be fined not more than $10,000 or imprisoned not more than 10 years, or both."

ion officials were threatening expulsion. In October, 1949 appellant had published a statement that all of those complications had been eliminated by the execution of the Non-Communist Affidavit.[4] At that same time appellant had certified to N.L.R.B. the names of the officers of his union, including his own as President, had certified that his union had filed its financial report with the Secretary of Labor for the preceding year, and had given copies of the report to its membership, and these documents, together with stampings showing their receipt, had been received through the mail by the Regional Office of N.L.R.B.

January 13, 1950, appellant had signed a Certificate of Intent stating that, within ninety days, his organization intended to refile financial data with the Department of Labor and to take the other steps represented by the documents above listed, and this too was in the N.L.R.B. files bearing proper receipt stampings. April 27, 1950, appellant had signed a certificate setting forth the names of the officers of his union for the ensuing year, including his own name as President and that too was in the N.L.R.B. file with a receipt stamping affixed. A like certificate signed by appellant under date of March 30, 1950 and bearing a similar receipt stamping appeared in the N.L.R.B. file.

The affidavit upon which appellant was tried was received in due course of mail on May 1, 1950, and the receipt stamping of the N.L.R.B. Regional Office appears on the affidavit. It came together with a letter upon the letterhead of appellant's union and signed by him asking that a Labor Organization Registration Form be sent to him, and the receipt stamping showing receipt on May 1, 1950 likewise appears on that letter.

The El Paso Regional Office of N.L. R.B. mailed to appellant a letter dated May 2, 1950 acknowledging the executed affidavit and advising appellant that his "organization will be considered in compliance with the filing requirements under Section 9(f) and (g) until October 10, 1950, and under Section 9(h) until April 28, 1951 * * *" This important letter was received by appellant and was produced from his file at the trial. Other acknowledgments of some of the documents above mentioned were offered in evidence and, in more than one, appellant was advised that, as the result of the documents he had sent in, his union was in full compliance with the Taft-Hartley Law. October 28, 1950, appellant signed N.L.R.B. Form 501 making a charge against an employer under the Taft-Hartley Law, and this document shows receipt by the El Paso Office and that the union's compliance status was checked by an employee of that office. Sometime after July, 1950, appellant admitted to another officer of his union that he had executed the Non-Communist Affidavit in 1950.

The proof of filing of the affidavit here is stronger than that approved in Hupman v. United States, 6 Cir., 1955, 219 F.2d 243, certiorari denied 349 U.S. 953, 75 S.Ct. 882, a case upon which appellant relies. We hold that the proof was ample to justify the jury in finding that appellant caused the affidavit upon which he was tried to be filed with the N.L.R.B.[5]

■ (2) Appellant is on no firmer ground in his contentions with respect to the other vital point in the case—that the evidence is insufficient to show that

---

4. The affidavit referred to was dated October 15, 1949 and will be dealt with later.

5. Appellant cites several cases from this court which are clearly differentiable. In Rolland v. United States, 5 Cir., 1953, 200 F.2d 678, the testimony showed that defendant had nothing to do with handling the accounts and bookkeeping, and there was no testimony to show that he had anything to do with furnishing the document there in question. Williams v. United States, 5 Cir., 1932, 55 F.2d 226, was a mail fraud case where actual lodging in the mail was essential to conviction; the court held that signing of the statement was a circumstance which might be considered to show mailing, but reversed because there were many other methods by which delivery could have been made than by use of the mails. The other cases are equally inapplicable.

he knew he was a member of or affiliated with the Communist Party on April 28, 1950. The Government's total proof that appellant was so connected with the Communist Party before and after that date was overwhelming. Five witnesses were introduced who were members of the Communist Party prior to the filing of the affidavit, and one who was a member and gave testimony to contacts with appellant after the filing of the affidavit. These included officers in the Communist Party, one being a product of the International Lenin School of Moscow, who was also an officer of the international union to which appellant's local belonged. One was a security officer of the Communist Party during a great portion of the time from 1948 until September, 1950 in New Mexico, the place of appellant's residence and activities. One witness was a member of appellant's local union, and was expelled from it because of his Non-Communist stand.

From these witnesses credible testimony was produced from which the jury was warranted in finding that appellant became active soon after his separation from the armed services in the Communist Party's program for infiltration of veterans' organizations, that he was an active member of the Communist Party in the Rocky Mountain region and the southwestern portion of the United States; and that, during 1949, his activity continued at an accelerated pace, during which time he was engaged in active work among the Mexican-Americans in the interest of the Communist Party; and that, before and after the affidavit of April 28, 1950 was filed, he urged upon the union members that they read the publications of the Communist Party. The proof of his activities subsequent to the date of filing was not as satisfactory as that covering the period before the filing, but the proof was of such a nature that the jury was warranted in accepting it as one of the circumstances from which it could find the basic fact of knowledge by appellant of his connection with the Party on the date of filing.

Appellant does not attempt to deny seriously that there was ample evidence from which the jury was warranted in finding that appellant was an active Communist. The chief emphasis is placed upon the contention that there is a hiatus of about a year from July, 1949 until July, 1950 in the Government's proof of Communist connections. Much of the argument is pitched around the extent to which the presumption of continuance may be indulged to buttress the actual proof of Communist membership and affiliation before the affidavit was filed. The court below did not charge the jury with respect to such a presumption, and we are called upon to consider it only to the extent of deciding whether the proof in the record and the presumption arising from it justified the court below in overruling the motion for acquittal and in submitting this question to the jury.

■■ It is axiomatic that the presumption of innocence attended appellant at every stage of the trial, and that the burden remained upon the Government throughout to prove each element of the crime charged beyond every reasonable doubt. After reading the evidence contained in this large record, we have no doubt that the Government sustained that burden with respect to each count of the indictment. It is not our duty to weigh the evidence, but to sustain the verdict of the jury if there is substantial evidence, direct or circumstantial, to support it, Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

Appellant's contention here is much like that made in Hupman v. United States, supra, concerning which the Court of Appeals for the Sixth Circuit there said, 219 F.2d at page 248:

"The appellant's argument seems to be that unless there is direct proof that appellant was a Communist on the very day the affidavit was signed or filed, the proof of violation fails. This impresses us as an absurdity, especially when the evidence shows that the appellant's instructions

were to avoid external indications of Communist membership while still maintaining connection with and giving support to the Party."

There is proof here of the same character as that mentioned in this quotation, it being the established policy that Communist Party members active in labor unions should not carry Communist cards, but should be entitled to a special kind of membership in the Party which afforded the least opportunity for detection.

■ Under the general heading of "Continuance Of Condition Or Fact", American Jurisprudence[6] thus states the applicable rule: "It is well established that when the existence of * * * a state of things is once established by proof, the law presumes that the * * * state of things continues to exist as before, until the contrary is shown, or until a different presumption is raised from the nature of the subject in question. The question as to the presumption of continuance of certain facts or conditions is largely a matter resting within the sound discretion of the trial court, to be decided in the light of the facts and circumstances of the particular case." The Supreme Court,[7] in dealing with a similar subject, presumption of continuance of possession and control, used this language:

"Under some circumstances it may be permissible, in resolving the unknown from the known, to reach the conclusion of present control from proof of previous possession. Such a process, sometimes characterized as a 'presumption of fact,' is, however, nothing more than a process of reasoning from one fact to another, an argument which infers a fact otherwise doubtful from a fact which is proved. * * *

"In any event, rules of evidence as to inferences from facts are to aid reason, not to override it. * * *

"The latter can be resolved only by the sound sense and good judgment of trial courts * * *.''

The principle here under discussion was applied by the Supreme Court[8] in a prosecution for distilling without registration of the still and giving bond. There was no direct proof that the still was not registered. The Court of Appeals[9] had affirmed a conviction notwithstanding absence of proof that the still was not registered, and the Supreme Court approved that action using this language, 289 U.S. 91, 53 S.Ct. 533: "The lower federal courts generally have accepted the doctrine that proof of the custody or control of a still for unlawful distillation of alcoholic spirits is enough to give rise to an inference of lack of registration and failure to give bond which the defendant must overcome by proof [citing cases]. The general principle, and we think the correct one, underlying the foregoing decisions, is that it is not incumbent on the prosecution to adduce positive evidence to support a negative averment the truth of which is fairly indicated by established circumstances and which, if untrue, could be readily disproved by the production of documents or other evidence probably

6. 20 Am.Jur., Evidence, Sec. 207, pages 205-6.

7. Maggio v. Zeitz, 333 U.S. 56, at pages 65–66, and 67, 68 S.Ct. 401, at page 406, 92 L.Ed. 476.

8. Rossi v. United States, 1933, 289 U.S. 89, 53 S.Ct. 532, 77 L.Ed. 1051.

9. Rossi v. United States, 7 Cir., 1932, 60 F.2d 955, 956:
 "Error is assigned because of the absence of direct evidence in the record to

show that the still was not registered or the bond approved as required by law. There are many circumstances shown in the record from which, unexplained, the court was warranted in finding that there was no registration or bond. The fact of registration and giving bond was peculiarly within the knowledge of the defendants. In view of * * * their failure to make any explanation, the conclusion that they had failed to comply with the statute seems to be a logical one. [Citing cases.]"

within the defendant's possession or control [citing cases]."

▮ We recognize that doctrine and the latter portion of the foregoing quotation in Colt v. United States, 5 Cir., 1946, 158 F.2d 641, 642, but declined to give effect to it in that case because the time element was too great (forty years), and the proof of the fact with respect to which the presumption was invoked was well within the Government's possession. We quoted from American Jurisprudence the following general rule applying in criminal cases:

"In criminal cases the law requires that the state shall prove all the essential facts entering into the description of a crime, and where the charge is grounded on a negative proposition or where the negative proposition is an essential element of the crime the burden is on the state to prove the charge. * * But where a negation is peculiarly within the knowledge of the defendant the burden is on him to establish that fact." [10]

▮ What we said in Bradford v. United States, 5 Cir., 1942, 129 F.2d 274, 277, in a prosecution for using the mails to defraud, wherein proof of circumstances pointing to defendant's guilt was unexplained, is pertinent here:

"These salient facts, standing out in the midst of many minor circumstances in evidence, were sufficient to require some contradictory or explanatory testimony (not necessarily by, but) in behalf of Will Bradford, or an inference of guilty knowledge reasonably could be drawn against him by the jury. The presumption of innocence is one of the strongest rebuttable presumptions known to the law, but it disappears when a verdict of guilty, supported by substantial evidence, is returned against the defendant.

"One is ordinarily presumed to intend the natural and probable consequences of one's acts. * * * A finding of guilty knowledge may be drawn from all the facts and circumstances in evidence. This is the only way scienter can be shown. In this case the circumstantial evidence of guilty knowledge was sufficient to exclude every reasonable hypothesis of the innocence of Will Bradford. Where evidence of scienter has been given, it may be rebutted * * *."

The uncontroverted proof of appellant's membership in and affiliation with the Communist Party over a period of years and of the degree of his devotion to its principles and of the many activities in which he engaged in furtherance of its mission made a strong case against appellant. His extended argument that he might have severed those connections or resigned from the Party for a period in order to avoid risking the penalties of Taft-Hartley is wholly unimpressive, especially in view of his failure to bring forward any evidence at all. If a dedication so complete and conviction so deep and a course of action so possessed of the attributes of permanence were to be interrupted or abandoned, it lay within easy reach of appellant to make proof of it by some of his associates (including his wife) whose names were freely given by the witnesses. We hold that the court below was amply justified in submitting to the jury the question of appellant's knowledge that he was a Communist when the affidavit was filed, and that the jury's verdict was amply supported by the evidence.

---

10. The following cases approve the doctrine of presumption of continuance as applied to criminal cases: United States v. Lesser, 2 Cir., 1933, 66 F.2d 612, 614; Crapo v. United States, 10 Cir., 1939, 100 F.2d 996, 1000; United States v. Perlstein, 3 Cir., 1942, 126 F.2d 789, 798; Jeffra v. United States, 4 Cir., 1948, 169 F.2d 218, 221; Noell v. United States, 9 Cir., 1950, 183 F.2d 334, 338. And cf. Kotteakos v. United States, 1946, 328 U.S. 750, at pages 757 et seq. and 763 et seq., 66 S.Ct. 1239, 90 L.Ed. 1557, in which the Supreme Court discussed the rationale of appellate review of convictions in criminal cases under Sec. 269 of the Judicial Code as amended, 28 U.S. C. § 391.

Complaint is made that the court below committed error in its charge to the jury defining membership in and affiliation with the Communist Party and in refusing charges on the subject requested by him. We have carefully considered the extended argument he makes and find it wholly unconvincing. Moreover, a similar attack was made and rejected in the Hupman case, supra, where the charge was substantially the same as here.

(3) The foregoing disposes of appellant's contentions that the evidence was not sufficient to establish the ingredients of the crime with which he was charged. It remains but to examine his complaint that the court erred in several respects in the mechanics by which the jury verdict was reached. First among those is the contention that the court below committed reversible error in admitting testimony concerning the filing of the affidavit of October 15, 1949. Appellant claims that the introduction of this former affidavit amounted to putting him on trial for a crime for which he was not indicted. But the court made it plain in its charge to the jury that the affidavit for whose filing appellant was being tried was that dated April 28, 1950.

The Government, on the other hand, contends that the evidence concerning the affidavit of October 15, 1949 was admissible under a well recognized exception to the rule that proof of the commission of other crimes is not admissible for the purpose of showing the commission of the particular crime charged. That exception is thus stated in American Jurisprudence: [11]

"Evidence of other crimes is always admissible when such evidence tends directly to establish the particular crime, and it is usually competent to prove the motive, the intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others, or the identity of the persons charged with the commission of the crime on trial."

In our view the facts of this case make it a typical one for the application of the doctrine of that exception. Appellant went to great lengths to develop by cross-examination of the Government witnesses that appellant and his union initially followed the definite policy of refusing to execute Non-Communist Affidavits. This was a plain effort to give color to the argument that appellant must not have executed the affidavit on which the indictment was based because of that established policy. The filing of the questioned affidavit six months before the one charged in the indictment was evidence that the previous policy had been abandoned. Moreover, appellant's mental state was an important element of the crime and the Government had to sustain the charge in the indictment that appellant did "unlawfully and wilfully make, use and cause to be made and used and filed and caused to be filed * * * a false writing * * * knowing the same to contain a false, fictitious and fraudulent statement * * *." The gist of the offense was that appellant had committed the overt act of filing the affidavit in order that his union might obtain benefits and advantages which were denied to those whose officers did not file affidavits. The Government carried the burden, therefore, of proving by evidence, direct or circumstantial, that appellant knew that it was necessary to file the affidavit in order to obtain those advantages, and that the filing of the affidavit did actually and as a matter of practice produce the desired benefits and advantages. That showing also was required to embrace proof that appellant intended to obtain those advantages by signing and filing the affidavit.

The affidavit of October, 1949, in connection with other circumstances in evidence and particularly appellant's published statement with respect to it, fur-

11. 20 Am.Jur., Evidence, Sec. 310, p. 289.

nished a competent and adequate medium for that requisite proof.

That statement, sent by appellant to the members of his union, advised them: that Phil Murray, C.I.O. President, was laying plans to "push our union out of the C.I.O." along with other unions threatened with expulsion; that preparations by the United States for a new war were started as soon as one war ended; that Taft-Hartley was putting labor in chains and was fomenting attacks on constitutional rights and civil liberties which was explained by the fact that the country had become war minded, a thing which had happened before in Germany; that some labor leaders felt so close to Wall Street that they decided that war and not peace might be the answer to the problems of American workers, and were committed not to building homes but blowing them up; that "Our Union" had "plugged for peace" and was threatened with expulsion along with ten others; that C.I.O. unions had been raiding each other, and that appellant's union had suffered greatly from these attacks and that his international union and its officers "have swallowed a lot of guff, a lot of insults; but that is not the point. None of that is important. Now that our union has signed the phony affidavits we can defend ourselves on a ballot in case of raids. We do not fear attack from that quarter any longer."

The affidavit which preceded or was simultaneous with this statement was necessary to make the statement intelligible. Together they showed a departure from the former policy of non-filing and the adoption of the policy of filing, and an accurate comprehension by appellant of the necessity for that change of policy and of the benefits which it was calculated to produce. It would be hard to picture a situation more typical for the application of the quoted exception, or one in which scienter could be established more convincingly.

Moreover, the handwriting expert testified that the same person who signed the October, 1949 affidavit, which appellant referred to in the statement as having been signed, also signed the affidavit on which the indictment was predicated, and the former affidavit was admissible to identify appellant as the signer of the 1950 affidavit, and to show a general scheme or plan on the part of the appellant to conform to the requirements of Taft-Hartley in order to obtain the benefits which were so vital to a solution of the problems described in the newspaper statement.[12]

The cases relied upon by appellant are not at war with the views here expressed, but sustain them. Both the Railton case [13] and the Hubby case [14] recognize the rule and the exception which is here applied. Railton was reversed because the charge of the court as to the questioned evidenced was too broad, and Hubby was reversed because "neither system nor intent was an essential element of the offense with which appellant was charged". Both cases referred to our decision in Weiss v. United States,[15] in which Judge Holmes reviewed at length the authorities dealing with the rule and the exception and set forth the reasons behind the exception. The reasons which impelled us to approve the receipt of evidence of other transactions there apply with equal force here, and this point is without merit.

12. The 1949 affidavit was also admissible as tending to show that appellant was familiar with the practice actually followed in such matters and the effect of the filing of the affidavit. It had on it printed instructions (see Note 3 supra) showing that, before a union could receive the help of N.L.R.B., each of its officers must file such an affidavit and the National Organization must file its affidavits in the Washington office, and that new affidavits must be filed each year.

13. Railton v. United States, 5 Cir., 1942, 127 F.2d 691, 692.

14. Hubby v. United States, 5 Cir., 1945, 150 F.2d 165, 167–168, 169.

15. 5 Cir., 1941, 122 F.2d 675; and see also Boyer v. United States, 76 U.S.App.D.C. 397, 132 F.2d 12; and Lloyd v. United States, 5 Cir., 226 F.2d 9.

552

■ (4) It is urged by appellant that the court below deprived him of elemental fairness in refusing to require the Government to particularize with respect to the overt acts upon which it intended to rely in proving the charges in the indictment that appellant was a member of or affiliated with the Communist Party. The court below overruled his motion for bill of particulars repeated by oral request during the opening statement of the Government. A bill of particulars is ordered only for cause, Rule 7(f), Federal Rules of Criminal Procedure, 18 U.S.C.A. The motion failed to show any cause for the requested order,[16] and the particulars desired related to the details of the evidence which the Government is seldom required to divulge. The question of whether a bill of particulars will be ordered is one addressed to the discretion of the trial court, Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545; Johnson v. United States, 5 Cir., 1953, 207 F.2d 314, certiorari denied 347 U.S. 938, 74 S.Ct. 632, 98 L.Ed. 1087.

■ Moreover, appellant failed entirely to demonstrate that he was prejudiced in any way by his failure to obtain a bill of particulars.[17] The argument would have more weight if appellant had sought to answer any of the Government's evidence supporting the charges in the indictment of which appellant did have full advance notice.

One of the important questions was whether appellant caused the affidavit of April 28, 1950 to be filed. The Government introduced sufficient proof from which the jury could find that appellant did cause the affidavit to be filed. Appellant had possession of the affidavit when he signed it, and had control of all of the employees in his office who had knowledge with respect to whether the affidavit was mailed to the Regional Office of N.L.R.B. Yet appellant produced no witness and introduced no testimony on the subject.[18] This contention has no merit.

■ (5) Appellant argues at length that he should have been permitted to explore the Government's file with the hope of turning up inconsistent statements by government witnesses Ford and Matusow. Upon a proper showing that the Government has possession of such inconsistent statements and the presence of the other requisite conditions, a person charged with crime would be permitted to examine and use them.[19] But no such showing was made here, and the court below properly refused to require the Government to produce its file or any part of it for inspection. Cf. Shelton v. United States, 5 Cir., 1953, 205 F.2d 806, Petition for certiorari dismissed, 346 U.S. 892, 74 S.Ct. 230, 98 L.Ed. 395.

■ (6) And we are not impressed by the claim of appellant that the court

16. Appellant filed a memorandum of authorities but made no showing by affidavit or otherwise upon which the court could justly have ordered a bill of particulars.

17. We said in the Johnson case, supra [207 F.2d 320] "Furthermore, there is nothing in the record to indicate that appellant was surprised or prejudiced by the action of the court in overruling the motion. The granting or denial of the bill of particulars rests within the sound discretion of the trial court * * *."

18. Moreover, appellant had ample warning that some of the witnesses introduced by the Government would testify and the course of the examination showed that his counsel had examined at least one of

them on a prior occasion and was familiar with testimony given by him before other governmental bodies. Further, the witnesses told of appellant's Communist activities carried on in the presence of his wife and other close associates. But appellant did not introduce any evidence by any of those patently available witnesses on these vital subjects or attempt to explain their absence or his failure to use them.

19. Gordon v. United States, 1953, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447; Bowman Dairy Co. v. United States, 1951, 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879; Goldman v. United States, 1942, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322.

below, in its charge, did not, as requested by him, warn the jury against acceptance of the testimony of the informers. The court was not bound to adopt the language of the charge requested by appellant, and the charge it did give was in conventional form and gave appellant adequate protection, and was practically the same charges as that given him in the Hupman case, supra. Appellant dwells upon his accusation that these informers were "involved in the despicably dirty business of informing for pay", and takes the prosecution to task for its reliance upon the testimony of such witnesses. The answer to that argument is, of course, that the Government has nothing to do with selecting the witnesses. The witnesses against appellant were determined when appellant chose those with whom he would fraternize.

One reading the record of this long case is impressed with the fact that the court below exercised wisdom and patience in seeing that appellant was given a fair trial. The record is more than one thousand pages long and the trial consumed nine or ten days even though there were only nine witnesses. Objections almost without number were made to the testimony of every witness and the court below heard them fully and his rulings were so fair that only one ruling on the admission of evidence is argued as error. The trial court permitted appellant in many instances to interrupt the examination of witnesses by the Government in order to test in advance whether questions which would be propounded by the Government would be proper. In several instances the trial was suspended to give appellant the opportunity to make preparations for cross-examination of witnesses after their direct examinations had been completed. The showing of the Government against the appellant was strong indeed, and the trial was fair and free of error. The jury found appellant guilty and was amply justified in doing so, and the judgment entered on its verdict is

Affirmed.