**UNITED STATES of America,**

v.

**Ann GLEASON, Mollye Karp and Frank Pitkin, Defendants.**

**No. 64 Cr. 348.**

United States District Court
S. D. New York.

March 14, 1967.

See also D. C., 259 F.Supp. 282.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, for the United States, Andrew J. Maloney, Asst. U. S. Atty., of counsel.

Jacob Oliner, New York City, for defendant, Ann Gleason, Jeremiah F. Cross, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant, Mollye Karp, Jay H. Topkis, Gerald D. Stern, Ira B. Shepard, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

This is a prosecution for attempted tax evasion against two women, Ann Gleason and Mollye Karp, who ran a business together during the pertinent years, and their accountant, Frank Pitkin, who kept their books and prepared the tax returns in question. During the period of nearly three years since the indictment, defendant Gleason has made a series of three motions—(1) for a bill of particulars, (2) to inspect grand jury minutes and dismiss certain counts, and (3) for a severance. Karp has made four motions—(1) for dismissal, (2) for a bill of particulars and inspection of documents, (3) for inspection of various statements, and (4) for a severance and discovery. Now, Gleason has moved again for a severance and for suppression of evidence. Karp has likewise moved for suppression, and, in addition,

for disclosure of any exculpatory evidence the Government may have, including specified kinds of evidence mentioned below. Since the motions to suppress are essentially similar, it has seemed convenient and appropriate to hear and decide them together, along with the disparate branches of the two motions.

### Gleason's motion for severance

As noted above, this is Gleason's second application for a severance. The first was denied on November 1, 1965, by Judge Tyler. Thereafter, however, defendant Karp applied for a severance from co-defendant Pitkin on the claim that this relief was essential in view of her plan and desire to call Pitkin in her own defense. That motion was granted. D.C., 259 F.Supp. 282. Following that development, Gleason moves again for a severance, urging that she should be tried separately because (1) she would prefer to be tried in a case where Pitkin was not called as a defense witness and (2) she should not be tried *with* Pitkin because a number of the counts against him do not concern her.

██ The first (and only new one) of her points is not impressive. In the bland form of its submission here—that defendants do not agree about the desirability of calling a particular witness—this kind of contention could serve substantially to vitiate Rule 8, Fed.R. Crim.P. When the case comes on for trial, Karp may have decided not to call Pitkin. Or Gleason may come to believe he should be called. Or the trial plans may remain divergent while the threat of prejudice to Gleason remains as speculative and unsubstantial as it now appears to be. At this stage, in any event, there is no sufficient showing warranting an order to preclude the joint trial of Karp and Gleason.

The problem may be obviated, moreover, if the Government chooses to try Gleason with Pitkin. She opposes this, too, but on grounds that have long since been considered and rejected by Judge Tyler. Nothing is shown to warrant

revision of his judgment on this renewed attempt.

The motion for severance will be denied.

### The motions to suppress

While their cases were being investigated, both Karp and Gleason gave net worth statements and made oral statements to the Special Agent who was exploring the question of possible fraud. In addition, their accountant, now co-defendant, Pitkin, armed with their power of attorney, delivered to the Special Agent books and records which now appear destined to be used as evidence against them. Seeking suppression of the foregoing materials, Karp and Gleason urge two points:

(1) That the statements they gave were taken in violation of the rights defined by Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). (2) That Pitkin was a faithless agent who "was double-dealing his clients and intentionally incriminating them" (Affidavit of Karp's counsel, par. 48); that the government agents must have known this, and that Pitkin may, indeed, have "worked outright for the Government on the promise of personal immunity, or favorable treatment" (Brief for Gleason, p. 8); and that, in either event, the government's agents knew or should have known of Pitkin's treachery, knew or should have known that his authority to represent Karp and Gleason was thereby dissipated, and should therefore have realized that accepting delivery of the books and records from his custody would amount to an illegal search and seizure.

Since the factual assertions underlying these contentions were disputed in the papers, and since some of the factual issues appeared potentially to be material, an evidentiary hearing was held. The hearing has served in large measure to erase the asserted grounds for suppression. What remains is disposed of because the movants' legal theory, under the first of their two arguments on this subject, seems erroneous.

█ 1. We disbelieve the testimony of Karp and Gleason that they had no idea they faced a threat of criminal liability until long after they gave statements to the Special Agent. We find, on the contrary, that they were warned by the Special Agent of this danger, told of their right to silence, and warned that things they said could later be used against them. However, they were not advised by him of the right to counsel, and thus were not afforded the full range of warnings and advice required under Miranda v. State of Arizona, supra. But this does not help them.

Escobedo and Miranda announce safeguards to be afforded a criminal suspect who is questioned while in custody or otherwise deprived of his freedom. Leaving aside other points of difference, the cases are clearly about custodial or similar interrogation, not only on their facts but in the words repeatedly used by the Court to define the new doctrine. See Escobedo, 378 U.S. at 479, 482, 488 and 490–491, 84 S.Ct. 1758; Miranda, 384 U.S. at 439, 440, 444, 445, 446, 457, 461, 465, 477, and 478, 86 S.Ct. 1602; see also, Davis v. North Carolina, 384 U.S. 737, 740, 86 S.Ct. 1761, 16 L.Ed. 2d 895 (1966); Johnson v. State of New Jersey, 384 U.S. 719, 729–730, 732, 86 S. Ct. 1772, 16 L.Ed.2d 882 (1966).

The movants here were neither in custody nor otherwise restrained, literally or figuratively, when they gave the statements they want suppressed. Mrs. Karp was interviewed in her business office at a meeting arranged and attended by her accountant, Pitkin. Miss Gleason went voluntarily, upon request, to a revenue office. Whatever unpleasantness may attend such conversations with tax investigators, it requires no long essay to conclude that the situation differs markedly from the jailhouse inquiries to which Escobedo and Miranda were subjected.

It may be, of course, as the subject of questioning by law enforcement officers is further reexamined, that the rules prescribed in *Miranda* will apply with increasing sweep. Extending them to the kind of situation involved here would be a huge step, with enormous consequences for the whole field of administrative investigation. This is not the first time the lower federal courts have been asked to make this sort of extension; the invitation has been repeatedly refused. United States v. Spinney, 264 F.Supp. 774 (D.Mass.1966); United States v. Schlinsky, 261 F.Supp. 265 (D.Mass.1966); United States v. Carlson, 260 F.Supp. 423 (E.D.N.Y. 1966); United States v. Hill, 260 F. Supp. 139 (S.D.Cal.1966); United States v. Fiore, 258 F.Supp. 435 (W.D.Pa. 1966). See also Kohatsu v. United States, 351 F.2d 898 (9th Cir. 1965), cert. denied 384 U.S. 1011, 86 S.Ct. 1915, 16 L.Ed.2d 1017 (1966). Cf. United States v. Sclafani, 265 F.2d 408 (2d Cir.), cert. denied, 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534 (1959); United States v. Knight, 261 F.Supp. 843 (E.D. Pa.1966); United States v. Davis, 259 F.Supp. 496 (D.Mass.1966). This court agrees with, and will follow, the results in the cited cases.

2. The search-and-seizure claim, relating to the books and papers delivered up by Pitkin, warrants even less discussion. After a long day's hearing extending into the night—with testimony given by Pitkin as well as the two ladies whose motions are here—the claim of Pitkin's "double dealing" remains tenuous. What is more important, the ladies have failed utterly to show that the government agents knew or should have known Pitkin was a traitor. *A fortiori*, the speculation that Pitkin was knowingly employed to betray his clients is baseless.

It becomes unnecessary, therefore, to conjure with the subtle theory that official investigators, dealing with an authorized agent, must be on the *qui vive* to know that the agent remains steadfast and must cease to deal with him when they have reason to believe that his principal is deceived in relying upon him. It is enough for present purposes that the investigators in this case behaved with entire propriety in accepting the records over which Pitkin had lawful custody and which he was (at least from the government's view) plainly entitled to furnish in his role as representative of his taxpayer-clients.

The motions to suppress will be denied.

### *The motion for production of exculpatory evidence*

Defendant Karp moves in expansive terms for an order "requiring the United States Attorney to disclose to [her] * * * any evidence in his possession or control favorable to defendant Karp or tending to exculpate defendant Karp or to establish any of her defenses to this prosecution including, but not limited to," some specific categories of material described and discussed hereafter. The motion is based primarily on the Supreme Court's pronouncements in Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

We consider first the most sweeping and general aspect of the motion—the demand for *any* evidence "tending to exculpate * * * or to establish any * * * defenses." On this level, the prayer is simply for an unqualified order at this pretrial stage that the Government cull from its files anything the defendant might find useful. While this has an extravagant sound on first encounter, there is a nice question whether a defendant's lawyer could fairly be expected to do otherwise. The theory is that defendant's central concern and primary right relate to matters peculiarly within the knowledge and control of the Government. Knowing the kind of thing he is entitled to have, but supposedly ignorant of what if any such things there are, defense counsel proceeds, not unreasonably, to demand whatever there may be.

Nevertheless, neither Brady v. State of Maryland, upon which defendant understandably relies, nor any other au-

thority cited or known to the court, suggests that the adversary character of criminal proceedings has been so far revised as to justify or require such sweeping disclosure. To be sure, *Brady* states the significant principle—authoritative for this court even if it may have been "wholly advisory," as Mr. Justice White said (373 U.S. at 92, 83 S.Ct. 1199)— "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id., at 87, 83 S.Ct. at 1196. Read too quickly, the quoted sentence might support the theory of Karp's motion. But the language itself, and a substantial context of principle and practice, impels a different conclusion.

■ The sentence defendant invokes from *Brady* concerns the "suppression * * * of evidence." "Suppression" denotes control and exclusive possession. Cf. Giles v. State of Maryland, 386 U.S. 66, 96, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967) (Mr. Justice Fortas concurring).[1] Thus, there is no reason to suppose that the Supreme Court, dealing with facts that actually presented such elements, meant to announce a revolutionary doctrine requiring the prosecution to prepare the case for the defense. To take an example close to the concrete circumstances of the instant case, where the prosecutor interviews witnesses known to both sides, there is no general requirement—certainly none "upon request" in advance of trial—that he deliver or report to defendant statements the defense would or might find helpful. Indeed, in the liberalized rule governing discovery in criminal cases lately approved by the Supreme Court, materials of this kind (namely, statements of prospective prosecution witnesses) are specifically excepted from those the defense is entitled to have before trial. See Rule 16(b), Fed.R.Crim.

P. See also United States ex rel. Meers v. Wilkins, 326 F.2d 135, 140 (2d Cir. 1964); id. at 141 (Hays, J., concurring). To be sure, the rule stated in the *Brady* case has the Constitution as its source, and the dimensions of due process are not limited or fully defined by the Rules of Criminal Procedure. But it makes obvious practical and doctrinal sense to consider the directly pertinent rules promulgated by the highest Court when appraising the meaning of the Constitution which is ultimately for that Court to expound. Cf. Giordenello v. United States, 357 U.S. 480, 485–486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).

■ Without undertaking to map a still largely uncharted area, it seems safe to take as a starting point the proposition that the prosecution need not deliver up, either before or during trial, all that would be literally embraced by defendant Karp's demand for "any evidence * * * favorable to * * * or tending to exculpate defendant * * *."

In fact, there is a question whether *any* such disclosure should or may be ordered prior to trial. At least one thoughtful opinion has outlined weighty reasons for a negative answer to this question. United States v. Manhattan Brush Co., 38 F.R.D. 4 (S.D.N.Y.1965); see also Carter, Suppression of Evidence Favorable to an Accused, 34 F.R.D. 87 (1964); but see Reznick, The New Federal Rules of Criminal Procedure, 54 Geo.L.J. 1276, 1283 (1966); Note, The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant, 74 Yale L.J. 136, 145, 149 (1964). It seems doubtful, however, that there should be a blanket rule postponing to the trial all disclosures of the type in question. For example, where the prosecutor knows of witnesses potentially useful to the defense, does not intend to call such witnesses himself, and knows—or should reasonably be expected to suppose—that his knowledge is not shared by defense

---

1. "In the end, any allegation of suppression boils down to an assessment of what the State knows at trial in comparison to the knowledge held by the defense." 386 U.S. at 96, 87 S.Ct. at 808 (Mr. Justice White concurring).

counsel, the information may come too late for effective preparation if it is not delivered until the case is on trial. Cf. United States ex rel. Meers v. Wilkins, 326 F.2d 135 (2d Cir. 1964); Ashley v. State of Texas, 319 F.2d 80, 83, 85 (5th Cir.), cert. denied, 375 U.S. 931, 84 S.Ct. 331, 11 L.Ed.2d 263 (1963); United States ex rel. Thompson v. Dye, 221 F.2d 763 (3d Cir.) cert. denied, 350 U.S. 875, 76 S.Ct. 120, 100 L.Ed. 773 (1955); Application of Kapatos, 208 F.Supp. 883 (S.D.N.Y.1962). Other kinds of instances will undoubtedly arise where the Government "has in its exclusive possession specific, concrete evidence"[2] of a nature requiring pretrial disclosure to allow for full exploration and exploitation by the defense.

■ Assuming, then, that some disclosure may be required under *Brady* in advance of the trial, the problem remains of administering a sweeping demand like Karp's for everything to which she may be entitled. A possible response to such a demand might be to observe that the constitutional duty of the prosecution under *Brady* is not different from other such duties—not to suborn perjury, not to employ illegally seized evidence, etc.— and that there is a presumption of compliance with the duty until or unless some concrete basis appears for rejecting the presumption. On this restful premise, the court might simply deny the motion and leave with the Government the burden of making appropriate and timely disclosures or risking the prospect of ultimate reversal. The unfortunate defect in this course is that it leaves with one (the more powerful) of the adversaries a critical period of unilateral control that must at least sometimes exact an unacceptable toll of unfair convictions. Cf. Griffin v. United States, 87 U.S.App.D.C. 172, 183 F.2d 990, 993 (1950).

An alternative course, followed in this case, is to call upon the prosecution to inform the court before trial of what it has that may be exculpatory. This procedure is by no means thoroughly satisfying. In cases of any magnitude, it may impose a considerable burden of labor upon both government counsel and the court. The responsibility is not eased by the device of requiring the Government's disclosure to be made *ex parte*. At least from the court's standpoint, the initial task of determining what might be exculpatory (as a prelude to considering what, if anything, should be disclosed) could be performed more comfortably and confidently in the light of adversary submissions. Without such illumination, there must persist a possibility that materials useful for the defense cannot be perceived as such in the relatively uninformed view of the judge considering a pretrial motion. It could be argued, therefore, if this problem existed in isolation, that defendants must be permitted to inspect for themselves what the Government has in order to know what they can fairly claim would be helpful to them. Cf. Jencks v. United States, 353 U.S. 657, 226 F.2d 540 (1957).

■ But the problem does not stand by itself. It must be handled in the context of the same adversary system that counsels against *ex parte* judgments wherever possible—a system in which the government's duty to expose the truth, guard against perjury, and protect witnesses cannot be squared with a wholesale obligation to make one-sided disclosure of its case. Cf. United States v. Manhattan Brush Co., supra, 38 F.R.D. at 7. Striking a balance between somewhat conflicting ends, we have thought that at least the first pretrial revelation to be required of the Government should be taken *in camera*.

The result has been to simplify the issue for the present case, though not so completely as the Government would simplify it. Instructed to produce "exculpatory materials of any kind * * * relating to the defendant Mollye Karp," the United States Attorney responded that he had none. But he produced for *in camera* inspection two transcripts of testimony by Karp's co-defendant, Frank

2. Giles v. Maryland, supra, 386 U.S. at 100, 87 S.Ct. at 810 (Fortas, J., concurring).

Pitkin, given under oath to an agent of the Internal Revenue Service. For reasons mentioned below, it is concluded that neither transcript, nor any part of either, should be made available to defendant Karp at this time. However, the court will require partial disclosure no later than the time of trial, for we do not share the prosecutor's certainty that none of the testimony could possibly be deemed favorable to Karp.

 Having read the fairly short transcripts, we find passages in both that could be deemed helpful in Karp's defense (together with much more, it should be said, that Karp would not find consoling). It is far from clear, moreover, despite the Government's confident assertion on the subject, that there could be no way for Karp to use the favorable portions as competent evidence. Without pursuing the question in detail, it may be noted that some of these passages could, at least arguably, be received on Karp's offer as declarations by Pitkin against his interests (and, at the same time, in Karp's interest). See 5 Wigmore, Evidence §§ 1460–61, 1465, 1476–77 (3d ed. 1940); McCormick, Evidence §§ 254–55 (1954). What is more significant, however, is that the prosecution's duty of disclosure as affirmed in *Brady*, cannot be limited to materials or information demonstrated in advance to be "competent evidence." Griffin v. United States, 87 U.S.App. D.C. 172, 183 F.2d 990 (1950); cf. Application of Kapatos, 208 F.Supp. 883 (S.D.N.Y.1962). The duty surely extends to favorable information unknown to the defense—e. g., the existence of witnesses, see United States ex rel. Meers v. Wilkins, 326 F.2d 135, 138 (2d Cir. 1964); Application of Kapatos, supra, an item of knowledge which is not, at least in itself, normally admissible in evidence. How far beyond admissible evidence the prosecution may be required to go it is not necessary to decide now. It is enough to hold that the Government may not resist disclosure on its own view—or even on the view of the motion judge before trial—that it will succeed on debatable evidence theories in blocking admission of the information demanded.

Concluding that the Pitkin statements may be in part helpful to Karp, we have proceeded to inquire whether any "respectable interest" of the Government [3] may be served by withholding this material. The prosecutor was asked to speak on this question. He responded with the observations that "the defendants are engaging in a fishing expedition" and "that anytime [*sic*] discovery of material is ordered in derogation of the Federal Rules of Criminal Procedure, the Government is injured." We have not found enlightenment in these pronouncements.

 There appears to be no reason for permanently withholding from Karp at least the portions of the Pitkin statements we find to be potentially exculpatory. These portions are, to specify them for future reference: (1) Question 162 and the answer thereto appearing at pages 26–29 of the first transcript (April 26, 1963), and (2) the material beginning with Question 154, on page 22, and ending with the answer to the final question (176), on page 25, of the second transcript (June 20, 1963). The passages thus identified are to be given to defendant Karp before the close of her defense or at such earlier point as the trial judge may specify. We conclude, however, as already stated, that she is not entitled to have them at this pretrial stage.

Two reasons appear to warrant this conclusion. First, the statements in question contain nothing Karp would find novel or unexpected. They tend at best to be evidence she might invoke to support her insistent and central thesis that Pitkin alone worked up the figures that are now claimed by the Government to have been fraudulent. She is entitled to seek the benefit of such evidence, but

3. Giles v. State of Maryland, supra, 386 U.S. at 98, 87 S.Ct. 793, 17 L.Ed.2d 737 (Fortas, J., concurring).

her need to have it now does not seem compelling.

The apparent lack of urgency makes it appropriate to give decisive weight at this time to a second ground on which the Government could justifiably postpone disclosure. As matters now stand, Pitkin may yet be called as a prosecution witness. Predicting that Pitkin would be a useful witness for her, and stressing the difficulty or impossibility of calling him if he and she were tried jointly, Karp has heretofore moved successfully for a severance of her trial from his. As a result, it may come to pass that Pitkin will be tried, or have his case otherwise terminated, first. The Government may then find itself in a position to call him as a witness against Karp. In this situation both 18 U.S.C. § 3500(a) and Rule 16(b) contemplate the withholding of Pitkin's statements until after he has testified on direct. There is no apparent reason for ignoring that restriction because Pitkin's statement, as is true commonly of statements by prospective government witnesses, may contain passages that seem favorable, along with those that are unfavorable, to the movant.

This is not to say that the timetable of the Jencks Act must always control in cases of this kind. As suggested earlier, there are kinds of exculpatory evidence of which a defendant should properly be apprised before trial in order to prepare and present an effective defense. If it should happen that such evidence is part of a statement covered by the Jencks Act, the statutory restrictions must be accommodated to the demands of due process. But no such adjustment seems necessary in this case. The government's legitimate interest in guarding against tailored testimony, coupled

with Karp's vivid awareness of what Pitkin might have to offer, makes it fair to postpone the ultimate disclosure ordered herein.

 Karp has also specified as materials she seeks any statements the Government may have from one Esse Salkind, a Karp employee expected to appear as a witness for the defense. The Government, in opposing affidavits, indicates that it has no such statements. It may be observed, however, that we would not order production of such statements at this time in any event. It is perfectly clear that Karp knows this prospective witness, is close to her, and has friendly access to her. It stretches the notion of "suppression" beyond recognition to say that the Government may not retain in its private files the records of interviews with such a potential witness.

Going further and assuming, without deciding, that statements of this general character may sometimes fall within the liberalized discovery provisions of Rule 16(b), the request for statements from a friendly witness like Salkind scarcely seems "reasonable" within the meaning of this provision. This conclusion is fortified by the provision of the Rule, subdivision (c), for reciprocal production by the defendant. It cannot be supposed that the framers of the Rule, or the Supreme Court in adopting it, intended (at least in the absence of unusual circumstances not shown here) to include among discoverable "documents" the statements or notes taken by the contending lawyers from witnesses or prospective witnesses equally available to both sides.[4]

It may be unnecessary to add that in deciding this final branch of defendant

---

4. A further point adverse to Karp bears mention. She has heretofore moved twice for discovery. Her second motion, made under the newly expanded Rule 16, was granted. When she made the motion, she had, and emphasized, her grounds for believing that Pitkin might be a source of exculpatory evidence. It is equally clear that she knew about Esse Salkind. She refrained, however, from seeking the material now in question though her quest is obviously in the nature of "discovery" and would appear to be within, at least very arguably, the terms of Rule 16(b). See Rezneck, The New Federal Rules of Criminal Procedure, 54 Geo.L.J. 1276, 1286 (1966). She makes no "showing of cause why" this subsequent motion "would be in the interest of justice." Rule 16(f).

Karp's motion, the court has relied, except to the extent indicated above, upon the government's representation that it possesses no exculpatory evidence.

### Conclusion

The motion of defendant Gleason is in all respects denied. Karp's motion is likewise denied, except that the Government must, subject to the rulings of the trial judge, disclose to her the portions of the Pitkin transcripts hereinabove designated not later than the close of Karp's defense at trial.

It is so ordered.