### UNITED STATES v. BURDICK.
### No. 11135.

United States Court of Appeals
Third Circuit.

Argued April 5, 1954.
Decided July 1, 1954.

John Henry Reiners, Jr., Camden, N. J. (Robert M. Taylor, Philadelphia, Pa., on the brief), for appellant.

Frederick B. Lacey, Newark, N. J. (William F. Tompkins, U. S. Atty. Dist. of New Jersey, Newark, N. J., on the brief), for appellee.

Before GOODRICH, KALODNER and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

This is an appeal from a conviction for income tax evasion under Section 145(b) of the Internal Revenue Code, 26 U.S.C. § 145(b).[1]

The appeal is premised on (1) alleged insufficiency of the government's evidence; (2) denial by the trial judge of defendant's motion to suppress as evidence his statements, oral and written, and certain records given by him to government agents in the course of their investigation of his tax returns; and (3) alleged prejudicial conduct of government counsel.

1. This section provides:

"Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

A brief statement of the factual background is in order.

The defendant, Lester H. Burdick was tried on a five-count indictment charging him with filing false and fraudulent income tax returns for the years 1946 to 1950, inclusive.[2] He was found guilty on all five counts and sentenced to jail for a year and a day on each of them, the sentences to run concurrently.

The evidence at the trial established that during the period involved the defendant was employed as an executive clerk of the New Jersey State Senate when it was in session and also did public relations work and sold radio advertising time. The latter activities were conducted from his home.

Defendant kept no books or records; he had only his cancelled checks and bank statements. During the course of an investigation by revenue agents prior to his indictment, defendant gave them a statement of his assets and liabilities as of January 1, 1946, and December 31, 1950, the opening and close of the taxable years here involved.

In computing defendant's alleged tax deficiency the government used what has come to be known as the net worth-expenditures method.[3] It based its case on the data obtained from the defendant and independent evidence of his personal expenditures; his receipt of substantial sums of money which he had not reported as income in his returns, because he treated them as non-taxable gifts; his various securities and real estate transactions.

The government presented a detailed analysis of defendant's bank records, brokerage accounts, real estate transactions, expenditures, unreported receipts and his own net worth statement previously referred to.

Revenue Agent Blackman, a government witness, submitted a calculation of defendant's net worth at the beginning of 1946 and for each of the taxable years involved. He testified that the defendant's expenditures for the five years under review were almost three times his reported net income for the period—$44,056.83 expenditures to $15,503.17 net income.[4]

At the trial the crux of the defense was that the government had placed an excessive valuation on listed assets, and moreover had erroneously included in such assets property which belonged to his wife; that it had not given effect to cash which he and his wife had kept on hand at home;[5] that his personal expenditures were less than those asserted by the government;[6] and that he had properly and in good faith treated un-

---

2. Individually for the years 1946 and 1947, and jointly (for himself and his wife) for the years 1948, 1949 and 1950.

3. For an excellent discussion of this method of proof see United States v. Caserta, 3 Cir., 1952, 199 F.2d 905; Montgomery v. United States, 5 Cir., 1953, 203 F.2d 887, 892.

4. Government's calculation with respect to the items listed:

|      | Net Worth Increase | Expenditures | Gross Income Reported | Net Income Reported |
| --- | --- | --- | --- | --- |
| 1946 | $3,518.78 | $8,078.89 | $4,610.00 | $2,986.29 |
| 1947 | 8,446.46 | 8,822.77 | 5,116.78 | 2,376.70 |
| 1948 | 805.64 | 12,035.45 | 5,195.55 | 3,077.92 |
| 1949 | 3,716.35 | 7,451.01 | 4,365.33 | 2,174.17 |
| 1950 | 3,986.64 | 7,668.71 | 5,839.25 | 4,888.09 |

5. Defendant testified that when his mother died in 1947, he had found $1600 in her trunk, which he kept. The defense also contended that Mrs. Burdick, the defendant's wife, had purchased out of cash which she had on hand, eighty-two $50 government bonds at a total cost of $3,- 075 in 1946–1947. The bonds were registered in the name of the defendant and Mrs. Burdick.

6. The government estimated defendant's living expenses at $2,000 a year basing that estimate on the defendant's admission that he spent $20–25 a week for

reported income as gifts. On the latter score it must be noted that defendant did not deny his receipt of the unreported sums which he treated as "gifts".

The trial judge in his charge correctly instructed the jury with respect to the issues presented by the testimony. He specifically charged the jury that there should be included in its determination of the defendant's net worth only such assets as belonged to him and that it was its function to determine the ownership of the various items of securities and real estate involved in the controversy. He further charged the jury it was its duty to fix a valuation of such assets as belonged to the defendant in the light of the testimony on that score and that it was for it to determine whether there had been any increase in defendant's net worth during the taxable years under review. He explicitly charged the jury on the issue of the defendant's expenditures. On the score of the unreported sums received by the defendant, the jury was charged it had to make a finding as to whether they were "gifts" or "taxable income", under stated applicable legal principles;[7] that in the event it found them to be taxable income, they must be eliminated from consideration in determining the guilt of the defendant "if his failure to report these items was due to an honest, even though mistaken opinion that these items were not subject to tax."

■■■ On review of the record we are of the opinion that the evidence amply sustained the jury's factual determination with respect to the issues of ownership of the controverted assets, their valuation, the increase in the defendant's net worth and the scope of his expenditures. The same is true with respect to the jury's finding that the unreported receipts were not "gifts" but income; that the defendant's failure to report them as income was not due "to an honest though mistaken opinion" as to their nature; and its ultimate finding that the defendant was guilty of willful evasion of the revenue statute.

There is no need to consider at length the defendant's contentions that the evidence failed to justify the jury's finding that the unreported receipts of approximately $14,500 from ten individuals were income and not gifts.

■■■ As we held in Smith v. Manning, 1951, 189 F.2d 345, 348 whether the receipts are gifts is primarily a question of fact to be resolved upon the peculiar circumstances of the case;[8] the mere fact that the payments were voluntary does not establish them as gifts;[9] if the payments were made without a donative intent and as compensation for services they constitute taxable income.[10] The term "gift" as used in the revenue statute "denotes * * * the receipt of financial advantages gratuitously."[11]

The testimony fully established that defendant's unreported receipts, which he treated as "gifts" were compensation for services rendered or to be rendered, even though the payments were volun-

---

household expenses alone. Defendant contended that his total household and living expenses were slightly more than half of the government's $2,000 figure.

7. The trial court charged:
"* * * In order to establish a gift, the circumstances surrounding the payment of money must disclose that it was the intent to bestow financial advantage gratuitously. If so, it is not subject to tax. A gift is nonetheless a gift because inspired by gratitude for past faithful service of the recipient; on the other hand, if the circumstances under which the payment was made disclose that it was for services rendered, or to be ren-

dered, then it must be considered income subject to tax."

8. Borgardus v. Commissioner, 1937, 302 U.S. 34, 58 S.Ct. 61, 82 L.Ed. 32; Commissioner of Internal Revenue v. Jacobson, 1946, 336 U.S. 28, 51, 69 S.Ct. 358, 93 L.Ed. 477.

9. Old Colony Trust Company v. Commissioner, 1929, 279 U.S. 716, 730, 49 S.Ct. 499, 73 L.Ed. 918.

10. Sportswear Hosiery Mills v. Commissioner, 3 Cir., 1942, 129 F.2d 376, 382.

11. Helvering v. American Dental Co., 1943, 318 U.S. 322, 330, 63 S.Ct. 577, 581, 87 L.Ed. 785.

tarily made. They could, at the least, be broadly identified as "gratuities" or "tips" and it is well-settled that such receipts are not gifts, but taxable income.[12]

Two examples will suffice. Captain David T. Hart, a commercial fisherman and "public relations man" for the Fishermen and Food Workers, testified that he gave the defendant his personal checks for $2,000 in 1947 and $1,000 in 1948. Hart said he was reimbursed by the group he represented. In 1949 and 1950 the defendant was paid $2,000 annually directly by the group.[13]

The nature of Hart's payments to the defendant is illuminatingly illustrated by the following:

"Q. What did you pay out your money for, Captain? A. I gave Mr. Burdick this money for educating me to the ways of the Legislature because of the knowledge he had of the Legislature. Being a fisherman, I had none. I had never been to the State House until 1946. We felt that during that period, Mr. Burdick did us the service we wanted. He certainly educated me in the ways of the Legislature, and he knew the routine to be followed."

George M. Harvey, Jr., an officer of the Outdoor Advertising Association, testified that the Association "paid" the defendant $500 in each of the years 1946, 1947 and 1948, and $1,000 in both 1949 and 1950. These payments were treated by the defendant as "gifts" and not reported in his returns.

Harvey was asked:

"Q. What did Mr. Burdick do for your association? A. Well, he kept us in touch with any bills that were introduced in the Legislature that he thought might affect our business, and at times he sent us copies of the bills and kept us advised with the progress of those bills in the Legislature.

"Q. And those payments and that type of service represents the usual type of service rendered by Mr. Burdick over all the years in question, is that right? A. Yes."

Defendant vigorously urges that the evidence did not justify the jury's finding that he willfully attempted to defeat and evade the payment of taxes due.

■ This question, of course, is one of fact. United States v. Smith, 3 Cir., 1953, 206 F.2d 905. But the government need not adduce direct proof of intent. Norwitt v. United States, 9 Cir., 1952, 195 F.2d 127, certiorari denied 1952, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 635. It may be inferred from the surrounding circumstances, " * * * and the inference may be drawn from a combination of acts and circumstances, although each separate act and circumstance standing alone is inconclusive." Gaunt v. United States, 1 Cir., 1950, 184 F.2d 284, 290, certiorari denied 1951, 340 U.S. 917, 71 S.Ct. 350, 95 L.Ed. 662.

By way of illustration, the Supreme Court, in Spies v. United States, 1943, 317 U.S. 492, at page 499, 63 S.Ct. 364, 368, 87 L.Ed. 418, stated:

" * * * we would think affirmative willful attempt may be inferred from conduct such as * * * destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal."

■ Here several items of evidence support an inference of willful attempt to defeat or evade the tax.

Special Agent Gerson testified that defendant told him that he kept certain memoranda and notes, but that they were always destroyed when his returns were

12. For an excellent discussion of "tips" and their taxable status see Roberts v. Commissioner, 9 Cir., 1949, 176 F.2d 221.
13. Defendant treated the money received from Hart in 1947 and 1948 as "gifts" and did not report it. Significantly he reported the money received from the Fishermen and Food Workers in 1949 and 1950 as income.

filed or soon thereafter. Willits, who prepared all of defendant's returns for the years under prosecution, stated that the defendant never produced any books or other financial records for his examination, nor ever informed him of the various money payments, heretofore adverted to, which are now contended to be gifts. Although defendant testified that, in response to his inquiry, the local Internal Revenue Office in "1940–1943 or 1944" had advised him that these money payments were not taxable, he was unable to say whom he had consulted. Furthermore, there was evidence from which the jury could infer that defendant sought to conceal some of his assets by having them carried in his wife's name. Finally, when negotiating for a loan in 1948, defendant told an appraiser for the Prudential Insurance Company that his annual income was about $10,000, notwithstanding the fact that his *reported* gross income for none of the prosecution years exceeded $6,000.

Subjected to the test set out in the Spies case, we think that this evidence was clearly sufficient to establish a *willful* attempted evasion of the income tax.

■ We come now to defendant's second point—that the trial judge committed prejudicial error in denying his motion to suppress certain evidence. The latter included defendant's bank and brokerage records, a net worth statement prepared by his accountant, Willits, and oral admissions, all of which were given or made by the defendant to Special Agent Gerson of the Intelligence Unit, Internal Revenue Service, during the course of the government's pre-indictment investigation of defendant's financial affairs. The motion to suppress was based upon the claim that when the above data and information was submitted to Special Agent Gerson, the latter allegedly failed to warn defendant that he did not have to testify against himself nor

give any information that might be used against him in a criminal proceeding.

We are of the opinion that the trial judge did not err in denying the defendant's motion to suppress.

It is well-settled that it is " * * * not essential to the admissibility of his [defendant's] testimony that he should first have been warned that what he said might be used against him", providing that the defendant's statement " * * was entirely voluntary and understandingly given. Such testimony cannot be excluded when subsequently offered at his trial." Powers v. United States, 1912, 223 U.S. 303, 312, 313, 314, 32 S.Ct. 281, 283, 56 L.Ed. 448.[14]

Pertinent to and dispositive of the defendant's contention is a recent decision of the United States Court of Appeals for the Fifth Circuit, Montgomery v. United States, 1953, 203 F.2d 887. It was there stated in 203 F.2d at page 892:

" * * * In the present case, Special Agent Baskett testified that * * * he never at anytime told the defendant that any document that was surrendered to him or his fellow agents would be used in either a civil or criminal prosecution against him. The defendant testified that, when Baskett and Government Agent Wilson first came to see him about his income tax matters, they told him that it was a routine check up, and that on each occasion he conferred with them, they told him it was purely a civil matter, that they would soon let him know how much taxes he owed, if any, and allow him to pay them, and that at no time was it intimated to him that there might be a criminal prosecution.* * * We do not think the circumstances under which the statements of the defendant and of his wife, and the cancelled checks and documents, were obtained were

---

14. As early as 1896, the Supreme Court in Wilson v. United States, 1896, 162 U.S. 613, 623, 16 S.Ct. 895, 899, 40 L.Ed. 1090, enunciated the rule that " * * *

the true test of admissibility * * * " was whether the statements were " * * made freely, voluntarily, and without compulsion or inducement of any sort."

sufficient of themselves to require that that evidence be excluded on the ground of being involuntary as a matter of law * * *. All of those circumstances were matters which went to the weight or credibility of the testimony thus obtained. (Citing cases.)"

To the same effect are United States v. Block, 2 Cir., 1937, 88 F.2d 618, certiorari denied 1937, 301 U.S. 690, 57 S.Ct. 793, 81 L.Ed. 1347; United States v. Heitner, 2 Cir., 149 F.2d 105, certiorari denied sub nom, Cryne v. United States, 1945, 326 U.S. 727, 66 S.Ct. 33, 90 L.Ed. 432; and Chieftain Pontiac Corp. v. Julian, 5 Cir., 1954, 209 F.2d 657.

In the instant case the uncontradicted testimony reveals that defendant was under no compulsion when he submitted the evidence in question to Special Agent Gerson. On direct examination Gerson described the circumstances surrounding his initial meeting with defendant as follows:

"I called him on the telephone to make an appointment for him to come in and give me such information about his financial background that I needed for the purposes of this case. I believe on the phone I told him * * * that it would be an informal meeting, and made an appointment with him to come in on November 6, 1951. He brought with him Mr. Willits whom he introduced as his accountant. I introduced myself to both of them, told them that I was a representative of the Intelligence Unit in Philadelphia, and I told them that it would be an informal meeting, and he could answer any questions that he wanted, or he could refuse. I also told him that anything he cared to give me would be voluntary. He said that he would be glad to cooperate with the department in any way. He said he would give me or the department anything I thought was necessary * * *."

When asked upon cross-examination whether he had warned defendant that anything said might be used against him in a criminal prosecution, Gerson replied: "I told him anything that he told me would be voluntary at that point."

Defendant's final contention is that the United States Attorney was guilty of prejudicial conduct during the course of the trial.

We are convinced, however, that though the government prosecuted with vigor, and was undoubtedly over-zealous at times, no substantial rights of the defendant were affected. The record reveals that the trial court maintained an attitude of impartiality throughout the trial and was quick to admonish government counsel in the presence of the jury when the proprieties required it. Furthermore, in his charge to the jury, he stated:

" * * * you, and you alone, are the sole judges of the facts in the case * * * you will not permit any invasion of your province to alone judge of the facts * * * I also call your attention that you should keep your minds uninfluenced by any extraneous remarks that may have been made by counsel in this case, particularly since the counsel table of the Government is traditionally close to the jury box. If you have heard any remarks or side remarks at Government's table uttered by the United States Attorney, you will exercise, I am sure, your good common sense and completely disregard them and not let them influence you in any way, in the case because only the evidence that you hear in the court room is the material on which you work and upon which you arrive at your verdict."

For the reasons stated the judgment of conviction and the sentence imposed thereon by the District Court will be affirmed.