BADGER METER MANUFACTURING COMPANY, Petitioner and Movant,

v.

James B. BRENNAN, in his capacity as United States Attorney for the Eastern District of Wisconsin, and Emil B. Nelson, in his capacity as District Director of Internal Revenue, Respondents.

Philip J. BERNER, Petitioner,

v.

James B. BRENNAN, United States Attorney for the Eastern District of Wisconsin, Respondent.

Nos. 59-C-119, 59-C-125.

United States District Court
E. D. Wisconsin.

Aug. 15, 1962.

James D. Porter and Irving W. Zirbel, Milwaukee, Wis., for Badger Meter Mfg. Co., Paul P. Lipton, Milwaukee, Wis., for Philip J. Berner.

James B. Brennan, U. S. Atty., Milwaukee, Wis., Philip L. Padden, Asst. U. S. Atty., for respondent.

TEHAN, Chief Judge.

The petitioners in these two actions, being Badger Meter Manufacturing Company in Case No. 59–C–119, and Philip J. Berner, its secretary-treasurer in Case No. 59–C–125, request return of certain property and its suppression as evidence in any criminal proceeding and seek to restrain the named respondents, their agents, etc. from using such property as evidence in any criminal proceedings. The actions were consolidated for hearing, at which hearing, the following facts were established:

On January 4, 1954, Frederick C. Stieber, then and now a special agent of the Intelligence Division of Internal Revenue Service was orally assigned by his superior to make an investigation of Badger Meter Manufacturing Company, hereinafter referred to as Badger. On that date, he interviewed an informant and at that time or shortly thereafter, obtained the informant's affidavit which stated that in the course of selling water meters to various municipalities, it was the policy of Badger to make kickbacks to certain city officials or employees at the rate of 10% of the cost of the water meters purchased and that Philip J. Berner was the company official who carried out that policy. The informant told Stieber that the kickbacks were paid through the medium of advances to salesmen. On January 7, 1954, Stieber, who, as a special agent, was concerned with investigating for possible criminal tax violations, requested that a case number be assigned to the investigation of Badger, indicating that at that time he believed his informant was reliable and that a full scale investigation was warranted.

Thereafter and on January 18, 1954, the Chief of the Intelligence Division sent a memorandum to the District Director, stating that an informant had presented information relative to alleged violations by Badger for the years 1949 to 1951 which would warrant a joint investigation and asking that an internal revenue agent be assigned to participate

with Stieber in such an investigation. On January 20, 1954, Revenue Agent Franklin P. Graf, who had previously been assigned to audit the company's 1951 income tax return, was assigned to participate with Stieber in the joint investigation. He and Stieber had a short conference on or about that date during which Stieber informed Graf that the investigation concerned kickbacks to public officials.

There is a dispute in the evidence concerning the early stage of the investigation. It is the position of the petitioners that Revenue Agent Graf appeared at Badger at least two weeks before Special Agent Stieber and examined its books and records for ten days under the guise of conducting an audit of the company's 1951 return, before being joined by Stieber on July 12, 1954. The respondents admit that Graf commenced his audit prior to the appearance of Stieber and did not then reveal either that he planned to investigate years prior to 1951 or that a joint investigation was in progress. They contend, however, that Graf spent only two days at the plant alone— July 1 and 2, 1954, and that Stieber and he appeared together on July 6th when Stieber was identified as a Special Agent. We have examined the conflicting evidence on this point, and it is our belief that Revenue Agent Graf began to examine the records of the company at least two weeks prior to July 6, 1954, and conducted such examination for ten days before being joined for the first time by Special Agent Stieber. In making this finding we have rejected Graf's unsupported testimony that he was at the company's plant for only two days, July 1st and 2nd, before Stieber's first visit on July 6th because Graf admittedly had almost no independent recollection of his investigation. Although he testified that his report showed that he began his investigation on July 1, 1954, that report was not offered in evidence. We have ac-

cepted July 6th as the date when the Special Agent appeared on the scene openly because it is supported by other evidence not dependent upon the memory of any witnesses. We further find that Graf went to the plant alone with the knowledge and consent of Stieber, who, as special agent, was in charge of the joint investigation, and that Graf was aware of the fact, when he went to the plant that the prime subject of the investigation was the kickback policy of the company and that the prime target of the investigation was Berner. We must also find that at all times after conferring with his informant in January, 1954, Special Agent Stieber well knew that Berner and not the company was the target of any criminal investigation, and we find that Graf was aware of this fact on his first visit to the company's plant.[1]

While working at the plant prior to July 6, 1954, Graf informed no one that he was participating in a joint investigation, stating only that he was to audit the books. Neither did he inform anyone that years prior to 1951 were being investigated. He received the cooperation of company personnel and was refused access to no records requested by him.

What we consider to be the second stage of the investigation commenced on July 6, 1954, when Special Agent Stieber began his open participation therein by joining Graf at the plant. It is uncontroverted that Stieber identified himself as a Special Agent on that date, but informed no one that he was there to conduct joint investigation with criminal implications. Company officials, including Berner, were then informed, however, that the Revenue Service had information that the company was allegedly making kickbacks through its salesmen. Stieber and Graf, working together, continued to receive the cooperation of company personnel after Stieber's identification as a Special Agent and after learn-

1. Although Stieber testified that the informant's affidavit set forth "more than one name" of persons principally concerned with Badger's kickback practice, this was not true. The affidavit named Berner only as the person carrying out the policy.

ing that the Revenue Service was concerned with kickbacks.

Prior to going to Badger's plant on July 6, 1954, Stieber had information about the existence of records regarding kickbacks, but had no description of any such records. Within several days thereafter, however, Stieber obtained from the company records, the name of Mrs. Towle, former secretary of Berner. He then interviewed Mrs. Towle, who gave him information describing the record as a "black book" and locating that book as being in a closet in Berner's office.

When Stieber began his investigation on July 6th and thereafter, he examined salesmen's expense accounts and ledger sheets looking for advance payments to salesmen and transcribing and abstracting from those records. On July 27, 1954, he requested Berner to furnish salesmen's correspondence files and Berner referred him to the company's attorney. After a conference with the attorney those files were produced. On that date, Badger admits, its attorney was informed that the investigation was a criminal investigation. Badger continued to make requested records available for examination thereafter.

The third stage of the investigation then began. On August 6, 1954, after interviewing Mrs. Towle, Stieber and Graf had a conference with Berner. Stieber asked for the black book and suggested that it was in Berner's closet, whereupon Berner told him to go and look if he thought it was there. Stieber looked and did not find it. It would appear that no flat denial of its existence was made by Berner, but rather that there was considerable fencing and "jockeying", since it is clear that Berner told the agents on that day that he would call them on August 16th or 17th to give them a decision, and Graf, at least, interpreted that as a statement that he was going to give a decision about producing the black book.

By August 25, 1954, Berner was represented by counsel, who inquired whether he should file a power of attorney. Stieber informed Berner's attorney that he

was examining Badger and not Berner. When questioned by adversary counsel and the court whether it was policy to commence prosecutions against corporations, Stieber disclaimed knowledge of policy but admitted that he knows of no prosecutions that were begun against corporations, giving rise to a fair inference that he was aware from the beginning of his investigation that he was investigating to determine possible criminal liability of an individual connected with Badger, that individual being Berner, the only person named by his informant.

We now come to what we consider to be the fourth stage of the investigation. On October 11, 1954, Berner, Secretary-treasurer of Badger, was summoned to appear before Stieber on October 21, 1954, to give testimony with respect to the tax liability of the company. He was directed to bring with him:

"The ledger book containing certain recordings relating to advance payments made to various salesmen of the Badger Meter Manufacturing Company; said ledger book containing sheets on which is recorded data relating to customers, invoice numbers, amounts of payments by customers, which form the basis for the advance payments to the salesmen."

Berner appeared as directed and was represented by counsel when he appeared. When he was asked whether he had produced the ledger book set forth in the summons, his attorney stated his legal position to be that *corporate* ledgers relating to salesmen's advances had been made available and that there was no single *corporate* record with that information. The attorney further stated that Berner denied that he had any *corporate* record as described, but neither admitted nor denied custody or control of a private record. He added that if the subpoena referred to a private record, Berner refused to produce it if he had it or to testify with respect to it on the grounds that he might be incriminated thereby. These statements were approved by Berner. His counsel also in-

dicated that he knew the investigation was for the purposes of considering possible criminal prosecution (though the investigation was still ostensibly of the company) and that evidence sought might incriminate Berner. At this stage it is clear that Berner knew he was a potential defendant in a criminal prosecution.

On February 3, 1955, Stieber filed a petition in this court alleging that Internal Revenue Service was investigating the tax liabilities of Badger, that Berner failed to comply with the summons of October 11, 1954 by failing to produce the corporate record described therein and in his custody as an official of the company or to testify with respect to the contents thereof and asking that a writ of attachment be issued pursuant to § 7604 of the 1954 Internal Revenue Code directing the United States Marshal to bring Berner before the court to show cause for his failure to comply, and that upon a hearing, the court order Berner to testify concerning the company. The court issued an order for attachment stating that Berner had not complied with the summons in violation of various sections of the Internal Revenue Code of 1954, directing the Clerk of Court to issue a writ of attachment, directing the Marshal to serve and execute the writ and ordering that upon the arrest of Berner he be brought before the court for a hearing. The writ was issued and Berner came before the court with his attorney on February 7, 1955. No objection was made by him or his attorney to the issuance of the writ or any of the proceedings before the court, and, on agreement of the parties, the matter was held in abeyance and Berner released on his own recognizance. No order was entered directing Berner to produce any records or give any testimony.

On March 4, 1955, Berner, again represented by very able counsel, appeared before Stieber. Badger's counsel was also present. Berner produced *two* ledgers, in compliance with the summons of October 11, 1954, and was given a receipt therefor describing the books produced as "1 black three ring binder containing 93 pages" and "1 black two post ledger containing 191 pages". Neither Berner, his attorney, nor the attorney for the company made any objection to production of these records. This material was photostated by Stieber and returned to Berner on March 16, 1955. Berner gave his receipt. The court proceeding was dismissed on March 11, 1955 on motion of the United States.

After obtaining photostats of the two books, Stieber requested and examined various records of the company.

No attempt was made at the hearing to identify all of the evidence which the petitioners seek to suppress. It was agreed by the parties that if the court determines that the petitioners are entitled to the relief sought they would stipulate to the evidence affected by that decision.

The investigation by Internal Revenue commenced, as we have stated, in 1954. On June 8, 1959, a complaint was presented to the United States Commissioner charging Berner with a violation of § 145(b), of the Internal Revenue Code of 1939 in connection with filing the company's return for the year 1952. This complaint, filed only two days before the statute of limitations for that year had run, was dismissed. Further prosecution involving that year is apparently barred. It is our understanding that prosecution involving the year 1953 was planned but that the statute of limitations for that year had run before action was taken. The only criminal case now pending in any way relating to the investigation previously described is Criminal Action No. 59–CR–94 in which Berner has been charged in a two count indictment with violating § 1001, Title 18 U.S.C. by falsely stating to Stieber and Graf on August 6, 1954 that no corporate record of advances to salesmen existed and by falsely stating (through his attorney) on October 21, 1954 in response to an administrative summons issued *October 21, 1954* [sic] that no corporate record as described in the summons existed.

Badger contends that all information obtained by Stieber and Graf from its books and records before July 27, 1954, the day when its attorney was told that a criminal investigation was in progress, and all evidence obtained through leads gotten during that period, were obtained during an unlawful search and seizure in violation of its rights under the Fourth Amendment to the United States Constitution. It also contends that the ledgers delivered to Stieber on March 4, 1955, and evidence obtained through leads gotten from the ledgers, were procured in violation of its rights under the Fourth Amendment because they were uncovered as a result of leads gotten prior to July 27, 1954, and because they were obtained by use of unlawful process. It asks that all said material be returned and suppressed as evidence against itself and any of its past or present officers or employees in any criminal proceeding.

Berner challenges the legality of the examination of Badger's records prior to July 27, 1954 and claims standing to ask suppression of all evidence obtained by means thereof because while the investigation was purportedly of Badger, in truth and in fact it was directed at him and he was the victim thereof.[2] He also contends that all oral statements made by him from the beginning of the investigation to and including August 6, 1954 were evidence obtained in violation of his rights under the Fourth and Fifth Amendments, and that statements made before Stieber on October 21, 1954 and March 4, 1955, the ledgers delivered to Stieber on March 4, 1955 and all evidence obtained as a result of leads found in the ledgers were also obtained in violation of his rights under the Fourth and Fifth Amendments.

The respondents contend primarily that the petitioners consented to the examinations here complained of and that Berner waived the rights under the Fifth Amendment which he here claims were violated.

We have examined the entire record herein and have considered with care the arguments of counsel presented in their extensive briefs and the many authorities upon which they rely, and have concluded that no violation of Badger's rights under the Fourth Amendment or Berner's rights under the Fourth and Fifth Amendments has been shown and that these actions must be dismissed.

■ At the outset we must state that we are here concerned only with the rights of Badger and Berner, the only parties appearing to assert that their rights have been invaded. Insofar as Badger seeks suppression of certain material as evidence against any of its past or present officers or employees, its petition must be summarily denied.

It is clear that Badger consented to examination of its books and records by Graf and Stieber during the first two stages of the investigation. Both Badger and Berner argue that this consent was not voluntarily and understandingly given, but rather was procured by fraud and deceit of the agents in failing to apprise Badger that a joint investigation, being "one that is initiated when probable fraud is indicated" (United States v. Wolrich (S.D.N.Y.1955) 129 F.Supp. 528 at 529) was being conducted and in misleading Badger into believing that the examination was a routine audit for the purpose of investigating civil liability only. We do not agree. We believe this case indistinguishable in any material respect from United States v. Wheeler (W.D.Pa., 1959) 172 F.Supp. 278,[3] at page 283 wherein the court stated:

"It is established that failure to warn a person suspected of crime of his constitutional rights does not of

2. In his brief, Berner claims that some material was taken from his own private office during that time, giving him rights not derived through the corporation to object to the search and seizure but no evidence supports this claim.

3. For a full statement of the facts upon which the defendant in that case relied in asserting that certain evidence must be suppressed, see United States v. Wheeler (W.D.Pa., 1957) 149 F.Supp. 445.

itself make his confession or admissions involuntary. Wilson v. United States, 1896, 162 U.S. 613, 623, 16 S.Ct. 895, 40 L.Ed. 1090; Powers v. United States, 1912, 223 U.S. 303, 313, 32 S.Ct. 281, 56 L.Ed. 448. And it seems to be pretty well settled that if a taxpayer freely consents to a tax examination of his records at the request of an internal revenue agent, as was done in this case, it is not to be concluded that his consent was enticed, induced, or rendered involuntary by the failure of the agent to divulge the purpose and instructions of his superiors or to warn the taxpayer that he is under suspicion of criminality. Turner v. United States, 4 Cir., 1955, 222 F.2d 926, a case involving both the Fourth and Fifth Amendments. See, also, United States v. Achilli, 7 Cir., 1956, 234 F.2d 797, affirmed 1957, 353 U.S. 373, 77 S.Ct. 995, 1 L.Ed.2d 918; Vloutis v. United States, 5 Cir., 1955, 219 F.2d 782; United States v. Burdick, 3 Cir., 1954, 214 F.2d 768; Montgomery v. United States, 5 Cir., 1953, 203 F.2d 887, where the agent made affirmative representations that the investigation was 'purely a civil matter'."

In affirming the defendant's conviction in that case, the Court of Appeals for the Third Circuit stated in United States v. Wheeler (1960) 275 F.2d 94, at page 97:

"The important relevant inquiry in this case is whether appellant freely gave his consent to have his records examined with the knowledge that his returns were being investigated. The answer to that inquiry is unequivocally, yes."

The court responded thus to its own inquiry despite the fact that in that case a revenue agent had been sent by his superiors to conduct a routine investigation of the defendant's records "with the additional mission of ascertaining involvement of Internal Revenue employees and defendant in any wrongdoing with a view to obtaining facts which would lead to criminal prosecution." (149 F.Supp. 445, at page 448) and that defendant was not informed of the underlying purpose of the investigation.[4]

■ In the instant cases, Badger concededly consented to examination of its records by Graf prior to July 6, 1954 and by Graf and Stieber to July 27, 1954. Its consent was given without coercion or duress and without promise of immunity from criminal liability or assurance that criminal liability would not be checked. We do not believe that the failure of the agents to inform anyone at Badger that the investigation was being conducted with a view to determining criminal as well as civil liability amounted to fraud, trickery or deceit vitiating the consent given.

■ We also believe that even if it were held that the failure to disclose the criminal implications of the investigation vitiated Badger's consent, the period affected by that failure is the period when Graf alone conducted the examination, that is, the period prior to July 6, 1954. On that date, Stieber's participation in the investigation was revealed and he was identified as a special agent. This identification, plus the information given on that date that the Revenue Service had heard that Badger was making kickbacks through its salesmen was sufficient to warn company officials that the investigation could have criminal implications.

In holding that the examination of Badger's records prior to July 27, 1954 was conducted with Badger's consent and without violation of its rights under the Fourth Amendment, we place considerable reliance on the opinion of our own Court of Appeals in United States v. Achilli (7 Cir., 1956) 234 F.2d 797.

Since the examination made prior to July 27, 1954, did not violate Badger's rights under the Fourth Amendment, we need not consider Berner's contention

---

4. We do not consider it significant that the criminal investigation initiated in the Wheeler case prior to the revenue agent's examination did not relate to tax evasion.

that he has standing to seek suppression of material obtained from the company during that period. Neither need we consider his contention that the Fourth Amendment requires suppression of statements made by him to the agents during that period since no unreasonable search and seizure occurred. We must, however, consider whether oral statements and admissions made by him to the agents through August 6, 1954 were obtained in violation of his rights under the Fifth Amendment. As we have stated previously, it is the position of the respondents that Berner's rights under the Fifth Amendment were waived.

■ The evidence reveals that neither Stieber nor Graf informed Berner that their investigation might lead to a prosecution of him, and that they were fully aware of the fact that he was the target of the investigation. Knowing this, Stieber stated as late as August 25, 1954, that he was examining Badger and not Berner, when asked by Berner's counsel whether a power of attorney should be filed.

We do not believe that Berner's rights under the Fifth Amendment were violated as a result of the conduct of the agents. Such a holding should in no wise be construed as approval of the methods and tactics here found to have been used. Berner made statements to the agents. He made them voluntarily, but without being informed of his rights and without being told that he himself was under suspicion. His counsel apparently concedes, however, that the failure to inform Berner of his constitutional rights did not, in and of itself, violate those rights. While the agents deliberately led him to believe that only Badger was being investigated, no claim is made by Berner that any promise of immunity was made to him or that he was given the impression that he would not be prosecuted. We cannot hold that Berner, in making statements to the agents, did not make them voluntarily and understandingly merely because he was not previously informed that he himself was under investigation.

■ In support of his contention that statements made and records delivered to Stieber on October 21, 1954 and March 4, 1955, were procured in violation of his rights under the Fourth Amendment, Berner first claims that Stieber had no authority under § 7602, Title 26 U.S.C. to summon him to appear before him, stating that under that section a summons can properly be issued only to aid in the determination and collection of civil tax liability, and that the Internal Revenue Code does not authorize issuance of a summons in support of a criminal investigation. We have examined the summons of October 11, 1954. That summons related to the tax liability of Badger. It may be that the criminal matter was in mind, but in our opinion issuance of the summons was justified by the existence of an investigation into any possible civil tax liability on the part of Badger.[5] It has not been shown that such an investigation did not exist.

■ Neither do we agree with the argument that putative criminal defendants cannot constitutionally be summoned under § 7602. The section itself does not limit the class of persons who may be summoned, and of course persons summoned are always free to assert their constitutional privileges.

■ Berner also asserts that by virtue of the issuance of the summons he was compelled to produce the ledgers—personal records or corporate records held in a personal capacity—and to make statements in violation of his rights under the Fifth Amendment. In our opinion the record clearly shows that any statements made by him before the special agent on October 21, 1954 and March 4, 1955, were voluntarily made, that the records produced by him on March 4, 1955 were voluntarily produced, and that any rights which he may have had with

5. See Lash v. Nighosian (C.A. 1, 1959) 273 F.2d 185, cert. den. 1960, 362 U.S. 904, 80 S.Ct. 610, 4 L.Ed.2d 554, and Boren v. Tucker (C.A. 9, 1956) 239 F.2d 767.

**434**

respect thereto under the Fifth Amendment were waived. Berner was represented by counsel during both appearances before Stieber, and invoked the protection of the Fifth Amendment during his first appearance. The mere fact that he appeared, produced records and made statements by reason of a summons does not constitute a violation of his rights under the Fifth Amendment. He was at all times free to assert those rights but he and his counsel chose not so to do.

We reject completely the contention that the commencement of enforcement proceedings in this court constituted unlawful coercion and compulsion resulting in Berner's surrendering the ledgers on March 4, 1955. No order was entered by this court directing Berner to comply with the summons of October 11, 1954, and it was at all times apparent that such an order would not be entered without Berner being afforded a hearing.

Because the ledgers produced on March 4, 1955, were not obtained in violation of Berner's rights under the Fourth and Fifth Amendments, we need not consider Badger's contention that seizure of the ledgers in violation of Berner's rights violated its own rights under the Fourth Amendment.

Both petitioners have complained of violations by the agents of the Internal Revenue Manual. These contentions cannot properly be made in pre-indictment petitions to suppress.

We have not considered herein the standing of each petitioner to ask the relief sought. The title as between the two petitioners to the ledgers which, we assume, are the prime evidentiary matters sought to be suppressed, need not and cannot on the record before us be determined.

Because in our opinion the rights of the petitioner in Civil Action No. 59–C–119, Badger Meter Manufacturing Company, under the Fourth Amendment, and the rights of the petitioner in Civil Action No. 59–C–125, Philip J. Berner, under the Fourth and Fifth Amendments,

have not been violated, the relief requested in these actions must be denied.

This memorandum shall stand as and for findings of fact and conclusions of law within the meaning of Rule 52(a) of the Federal Rules of Civil Procedure. Counsel for the respondents will prepare an order for judgment and submit it to opposing counsel for approval as to form.