**UNITED STATES of America**

v.

**Fred P. FIORE.**

**Cr. No. 66–28.**

United States District Court
W. D. Pennsylvania.

Sept. 14, 1966.

Gustave Diamond, U. S. Atty., by Stanley Greenfield, Asst. U. S. Atty., Pittsburgh, Pa., for United States.

Hubert I. Teitelbaum, of Morris, Safier & Teitelbaum, Pittsburgh, Pa., for defendant.

### OPINION AND ORDER

MARSH, District Judge.

The defendant, Fred P. Fiore, was indicted February 10, 1966, on four counts, each charging him with willfully and knowingly making and subscribing to false statements in his income tax returns for the years 1959, 1960, 1961, and 1962 in violation of § 7206(1) of Title 26 U.S.C.A. While the defendant is charged with knowingly and willfully understating his income from three separate sources, the indictment stems primarily from investigations which resulted in allegations by the United States

that the defendant during these years owned certain Gulf Oil stock from which he received substantial dividends not declared on his returns.

Before the court is defendant's motion to suppress certain evidence obtained by Internal Revenue agents by interrogation of the defendant on two occasions and by the taking of notes by one agent on one of these occasions from certain records placed at the agent's disposal by the defendant and his accountant. At a hearing, testimony concerning the circumstances of these disclosures was given by the defendant and by the two Internal Revenue agents assigned to the case.[1] Initially, it should be stated that the defendant did not have counsel present at either of the meetings which will hereafter be described, nor did he seek the advice of counsel concerning these investigations until after the meetings had taken place.

The defendant rests his motion solely on contentions that the evidence was obtained in violation of his rights under the Fifth and Sixth Amendments. The defendant does not expressly assert that the evidence was obtained by coercion, fraud, misrepresentation or deceit, or other than "voluntarily". Rather, the defendant urges that deception was implicit in the failure of Internal Revenue agents to apprise the defendant when their investigations became in fact an inquiry into possible criminal conduct, and likewise in their failure to warn the defendant of his constitutional rights at such time.

More specifically, the defendant contends that the test of "voluntariness" as defined and applied in cases such as United States v. Burdick, 214 F.2d 768 (3d Cir. 1954), and United States v. Wheeler, 172 F.Supp. 278 (W.D.Pa. 1959), aff'd 275 F.2d 94 (3d Cir. 1960), can no longer be deemed dispositive of questions of suppression of evidence in light of recent Supreme Court decisions. In both *Burdick* and *Wheeler*, the defend-

ants argued that admissions made to Internal Revenue agents in the course of investigations of their income tax returns should have been suppressed because they were obtained in violation of the Fifth Amendment. In each case, however, it was held that the test of admissibility was whether the statement was entirely voluntary and understandingly given, and that failure to warn a person that he did not have to testify against himself and that any information given might be used against him in a criminal proceeding did not make the admission involuntary. The cases relied upon were Powers v. United States, 223 U.S. 303, 32 S.Ct. 281, 56 L.Ed. 448 (1912) and Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090 (1896).

No violation of the Sixth Amendment was asserted in either *Burdick* or *Wheeler;* the dates of the cases would suggest why. The defendant in the present case, however, cites Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); and United States ex rel. Russo v. State of New Jersey, 351 F.2d 429 (3d Cir. 1965), in support of his position that statements and information obtained when he was without benefit of counsel were in violation of his rights under the Sixth Amendment. Subsequent to the hearing and argument on the motion, the Supreme Court decided Miranda v. State of Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).

 *Miranda* rests the Sixth Amendment right to counsel squarely upon the Fifth Amendment right against self-incrimination and additionally establishes express conditions of warnings concerning constitutional rights and demonstration of intelligent waiver of such rights while the individual *is in custody at the police station or otherwise deprived of his freedom of action.*

1. The defendant's general counsel also testified concerning events subsequent to the two interviews, but since he did not attend these meetings, his testimony added no facts concerning the manner in which the agents obtained the evidence at issue.

In absence of the observance of such conditions, all statements, whether intended or tending to be inculpatory or exculpatory, are inadmissible. Miranda v. State of Arizona, supra, pp. 476–477, 86 S.Ct. 1602. The impact of the *Miranda* decision upon Supreme Court cases relied upon in the decisions in *Burdick* and *Wheeler* was noted by Justice Harlan in his dissenting opinion (p. 509, 86 S.Ct. p. 1646):

"* * * [I]n practice and from time to time in principle, the Court has given ample recognition to society's interest in suspect questioning as an instrument of law enforcement. * * * Of course the limitations imposed today were rejected by necessary implication in case after case, the right to warnings having been explicitly rebuffed in this Court many years ago. Powers v. United States, 223 U.S. 303 [32 S.Ct. 281]; Wilson v. United States, 162 U.S. 613 [16 S.Ct. 895]."

While *Miranda* does not expressly overrule *Powers* or *Wilson*, it is evident that to the extent that *Miranda* (and *Escobedo* and *Russo* before it) adopts a doctrine which implicitly modifies the criteria of these earlier opinions, the present status of the "voluntariness" test adopted by both *Burdick* and *Wheeler* is arguably in question. In short, we are called upon to determine whether recent Supreme Court cases imposing specific conditions of limitation upon police interrogations must be deemed equally applicable to Internal Revenue investigations. If so, a more exact meaning attaches to the term "voluntary" than heretofore. We conclude, however, for reasons we shall set forth, that such cases have no application to income tax investigations in respect to either Sixth or Fifth Amendment rights. First, we will state the facts from the testimony at the hearing.

In the period covered by the indictment, the defendant was primarily in the business of stripping and selling coal and excavating for commercial buildings. (T., p. 10.) For the years 1958, 1959, and 1960, he filed returns which were audited. Certain adjustments to his tax liability were made in each instance, and he was required to pay additional taxes for each of these years. (T., p. 13.) These audits bear on this motion only insofar as they tend to establish the defendant's frame of reference with respect to Internal Revenue audit and investigative procedures when he was confronted by agents making the investigation which led to this indictment.

The defendant's 1961 return was assigned for audit in the latter part of 1962 to revenue agent George Skoufis, a field auditor (T., p. 40). Skoufis commenced his audit in early March, 1963. As a revenue agent, he was primarily concerned with the civil aspects of a tax case, and was "specifically instructed at the first indication of criminal aspects to discontinue the examination and notify our Intelligence Division * * * through channels * *." (T., p. 41.)

Skoufis met twice (March 1st and March 15th) with the defendant's accountant, William McArdle, at the latter's office without the defendant being present (T., p. 62). On these two occasions, Skoufis examined and made notes of certain records, mostly cancelled checks and bank statements (T., p. 42). Skoufis then requested and arranged for a meeting with the defendant, which took place at the defendant's apartment (T., p. 62) on March 28th, with Mr. McArdle also present (T., p. 59). He did not at any time warn or suggest to the defendant or his accountant that the defendant could have, or should have, counsel present at this meeting. (T., pp. 47–52.)

The defendant vigorously urges that a most significant fact is that prior to this meeting, Skoufis was in possession of certain information obtained "from a Federal Agency * * * concerning the possibility of the possession of Gulf Oil stock" by the defendant in 1961, since he then knew from examination of the 1961 return that the defendant had reported no dividends on such

stock in that year (T., p. 50). This was the moment, according to defendant, when a routine audit to determine civil liability for tax became a criminal investigation.

At this meeting Skoufis asked the defendant whether he had any "stocks not shown in his returns" (T., p. 49), making reference both to stock in general and to Gulf stock in particular (T., p. 50). Skoufis testified that he "had no definite information that would have indicated to me any Criminal elements as of this date which was March 28, I believe, of 1963." (T., p. 52.) But after the meeting he made an oral report to his superior in which he "specifically said" that he "had reason to believe" that the defendant "as of that date owned certain Gulf Oil stock." (T., p. 54.) Subsequently, Skoufis made further inquiry and discovered that the defendant had received substantial dividends in 1961 that were not reported on his 1961 return. He immediately referred the case to the Intelligence Division (T., p. 55).

Skoufis made an appointment for a second meeting with the defendant (T., p. 56), which took place on August 2, 1963 at accountant McArdle's office (T., p. 66). Present were Skoufis, McArdle, the defendant, and William McMahon, a special agent with the Intelligence Division (T., pp. 64, 66). Prior to this meeting, Skoufis did not tell McArdle that a special agent responsible for criminal investigations had been assigned to the case, nor that the purpose of the meeting was for McMahon to interview the defendant concerning possible criminal aspects of the case (T., pp. 56, 66).

At the August 2nd meeting, special agent McMahon first placed the defendant under oath. He then advised the defendant of his constitutional rights in that he was not required to answer any questions, make any statements, or supply any records that he thought would incriminate him under federal law. The defendant said that he understood. (T.,

pp. 20, 67.) There was no mention of the defendant's right to counsel. The defendant testified that he did not invoke the Fifth Amendment at any time. He acknowledged that he knew that he did not have to say anything that might incriminate him, and when asked to confirm his denial that he invoked the Fifth Amendment, he said: "I absolutely did not, because if I was going to take the Fifth Amendment, I would have taken it on the whole question and answer." (T., p. 30.) McMahon testified that the defendant did invoke the privilege. McMahon described the critical stages of the interview in these words:

"On two occasions he declined to answer. In the first instance, I asked Mr. Fiore after having him identify his 1958, 1959, 1960 and 1961 Tax Returns, I asked him if these returns contained all the income that he had during these years, and at that point, he declined to answer on the basis that it would tend to incriminate him. Later in the interview I asked Mr. Fiore if he had any stock accounts or brokerage accounts. He again declined to answer on the basis that it would tend to incriminate him." (T., pp. 67–68.)

Again, McMahon's testimony concerning the conclusion of the interview is significant:

"And Mr. Fiore later in the interview did answer these questions only at the conclusion of the interview when I asked Mr. Fiore if he had any statements that he wished to make in his own behalf. At that point, Mr. McArdle asked, 'What were the Gulf dividends?' The interview was drawing to a close, and I asked Mr. Fiore if he wished to make any statements in his own behalf, and he said that he did not. At that point is when Mr. McArdle said, 'What were the Gulf dividends that Mr. Fiore was supposed to have?' I stated that we did not discuss any Gulf dividends during this interview. It was only then that the area was opened up, and at that time

Mr. Fiore did admit to having the Gulf dividends." (T., p. 69.)

Though the defendant ultimately gave the information regarding the Gulf dividends, he never answered the question of whether all his income was reported on his 1958 through 1961 returns. (T., pp. 69–71.)

The defendant first contends that when in the course of this investigation, the investigating agents began to suspect fraud and began to act on the presumption that criminal conduct was involved, he became entitled to representation by counsel because at that point the investigation had "begun to focus on a particular suspect". Escobedo v. State of Illinois, supra, 378 U.S. p 490, 84 S.Ct. p. 1765. He contends that the accusatorial stage was reached either at the moment, or some time after the moment, that revenue agent Skoufis: (1) knew for a fact that no dividends on Gulf stock had been declared on the defendant's 1961 return; and (2) was possessed of information, received from another Federal Agency, that the defendant owned, and had received substantial dividends on, Gulf stock in 1961.

The sole question, insofar as right to counsel under the Sixth Amendment is concerned, is whether or not there exists a right to counsel in a criminal investigation into possible tax fraud, and, if so, when that right attaches. The defendant's position is that the right exists and does attach because the nature of the investigation brings it within the scope of Escobedo.

We need not pursue this question through all stages of the investigation, however. We discuss the Sixth Amendment aspect only in respect to the interrogation by special agent McMahon on August 2nd, for it is plain that if the accusatorial stage was not reached when this inquiry became unquestionably an investigation solely directed to possible criminal conduct, then, a fortiori, it did not become accusatorial at any preceding stage.

Post-Escobedo cases dealing with suppression of evidence obtained by Internal Revenue agents are Kohatsu v. United States, 351 F.2d 898 (9th Cir. 1965), and Rickey v. United States, 360 F.2d 32 (9th Cir. 1966). In pattern, if not in factual detail, the Kohatsu case is substantially analogous to the case at bar. A revenue agent commenced an audit of the defendant's return and met with the defendant on two occasions and obtained a statement. Based on information the revenue agent obtained, the investigation was referred to special agents of the Intelligence Division who held further meetings with the defendant. The same argument was advanced by the defendant in Kohatsu v. United States, supra, 351 F.2d p. 900, namely:

"[T]hat * * * [a] 'routine civil tax investigation' undergoes a fundamental change when (1) a revenue agent discovers facts indicating substantial unreported income, and (2) the facts are such that the revenue agent suspects fraud. It is appellant's position that when these events occur, the investigation 'has begun to focus on a particular suspect' and that from that point 'government agents have a duty to inform the taxpayer of his right to counsel, and that they must not elicit further incriminating evidence from the taxpayer until he has been informed of his constitutional rights in specific, understandable terms'."

The Ninth Circuit rejected this argument noting, at p. 901:

"In the instant case the essential question to be determined by the investigations of the revenue agents was whether in fact any crime had been committed. The accused had not been indicted or arrested."

The Court concluded that the agents were conducting an investigation, that the accusatorial stage had not been reached, and that there was "nothing in the Escobedo opinion or its 'philosophy'" (id., p. 902) which would impose a duty upon Internal Revenue agents to inform the taxpayer of the criminal nature of the investigation or his absolute consti-

tutional right to remain silent under the Fifth Amendment.

The defendant argues eloquently that *Escobedo* should apply to income tax investigations. There may indeed be aspects to a criminal tax investigation by special agents of the Intelligence Division that might be deemed to make it indistinguishable from any other criminal investigation. But in one respect, it is different. The usual criminal investigation commences with the independent establishment of the commission of a crime which projects a ring of evidence large enough to bring the suspect within its circle. The process of further "general inquiry into an unsolved crime"[2] gradually pulls the suspect toward the center of all evidence until investigation ultimately begins to focus upon him. In a tax investigation, however, the defendant stands in the center of the inquiry from the beginning, as the only possible suspect, while, as investigation proceeds, the ring of evidence expands and builds around him. For this reason, the distinction between "investigative" and "accusatorial" stages may not be entirely apposite to criminal tax investigations. The defendant urges with vehemence that an individual under investigation for income tax fraud or willful falsification is subjected to compelling psychological pressures which can be employed to extract incriminating statements from him, and that he is therefore quite as much in need of counsel to preserve his constitutional rights as a suspect in custody who is under interrogation concerning a crime established by independent evidence.

However true this might be, we are concerned only with whether *Escobedo* applies to such investigations, and we conclude that it does not. Any question left open by *Escobedo* was closed, we believe, by the statement of the Court

in Miranda v. State of Arizona, supra, 384 U.S. p. 444, 86 S.Ct p. 1612:

"By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.[4] ",

"4. This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused."

Nor do we think that the defendant can gain support for his position from Massiah v. United States, supra. *Massiah* had retained a lawyer and though free on bail was under indictment when federal agents obtained, via radio transmitter, the statements which the Court held could not constitutionally be used as evidence against him in his trial. *Massiah* differs markedly on its facts, and the Court leaves no doubt that it was influenced in its decision by the trickery employed by the government agents. Massiah v. United States, supra, 377 U.S. pp. 206–207, 84 S.Ct. 1199. For these reasons, we do not believe *Massiah* merits further discussion.[3]

Lastly, there is the clear intendment of the Court in *Miranda* that the requirements of a warning of constitutional rights and a demonstration of voluntary, knowing and intelligent waiver of those rights are to be confined to situations of "custodial interrogation". The reiteration of this term throughout the opinion and the prefacing of the decision with a lengthy recital of police abuses leaves no doubt as to what situations the Court had in mind in reaching its decision.

We find nothing in *Miranda* to suggest that these same safeguards are to be construed as mandatory in the type of investigative questioning to which the defendant here was subjected. Though hardly to be characterized as

2. Escobedo v. State of Illinois, supra, 378 U.S. p. 490, 84 S.Ct. p. 1758.

3. McLeod v. Ohio, 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965), cited by defendant, is also inapposite. The defendant in that case was both under indictment and in custody when he made an oral confession. See: State v. McLeod, 1 Ohio St.2d 60, 203 N.E.2d 349 (Ohio 1964).

pleasant, neither of these meetings resembled a "custodial interrogation".[4] Agent Skoufis questioned the defendant in defendant's own apartment. Special agent McMahon questioned him at the office of his accountant. McMahon warned the defendant of his right to remain silent, and while Skoufis did not, the absence of a warning, we believe, is no ground for suppression of any portion of the evidence. As noted earlier in this opinion, it was well settled under Powers v. United States, supra, 223 U.S. p. 313, 32 S.Ct. 281, and Wilson v. United States, supra, 162 U.S. p. 623, 16 S.Ct. 895, that it was not essential to the admissibility of the defendant's testimony that he should first have been warned that what he said might be used against him. *Miranda*, in our view, supersedes this rule only in the context of a custodial interrogation.

Specifically, we hold that in the circumstances of the investigation under consideration, *Miranda* has no application in defining rights under either the Sixth or Fifth Amendment.

The remaining question is whether the defendant, at any stage of this investigation, asserted his right to remain silent under the Fifth Amendment and, if so, whether any evidence was obtained in derogation of that right. We find from defendant's own testimony that he did not assert any such right and his declarations to the agents were voluntary.

In conclusion, we find no grounds under either the Fifth or Sixth Amendment to warrant suppression of any evidence obtained by these agents. We deem the holdings of *Escobedo*, *Russo* and *Miranda* inapplicable to investigations of this kind and find that "voluntariness" remains the test of admissibility of evidence procured in these circumstances as held in the cases of United States v. Burdick, supra, and United States v. Wheeler, supra. The

record fully supports a finding that, under *Burdick* and *Wheeler*, the defendant gave all information voluntarily.

An appropriate order will be entered.

---

4. As characterized by Judge Goodrich in United States v. Frank, 245 F.2d 284, 286 (3d Cir. 1957), " * * * we do not think any taxpayer considers an audit by a revenue agent to be a call for purely social purposes."