**UNITED STATES of America,**
**Plaintiff,**

v.

**Harold W. GOWER, t/a Gower's Service**
**Station, Defendant.**

**No. 14096 Cr.**

United States District Court
M. D. Pennsylvania.

June 30, 1967.

Bernard J. Brown, U. S. Atty., Scranton, Pa., for plaintiff.

Leo McCormack, Scranton, Pa., for defendant.

NEALON, District Judge.

## MEMORANDUM

Defendant, Harold W. Gower, t/a Gower's Service Station, Lehighton, Pennsylvania, has been charged in a four-count indictment with violating Section 7203 of the Internal Revenue Code of 1954, 26 U.S.C. § 7203, in that he failed to file Retail Dealer's Excise Tax Returns for the quarterly tax periods ending December 31, 1962; March 31, 1963; June 30, 1963, and September 30, 1963. Defendant previously filed a motion for production of subpoenaed documents and a motion to suppress evidence. On August 27, 1965, the motion to produce was granted to the extent that the Government was ordered to produce the requested documents and to turn them over to the Court for an in camera inspection. A hearing on the motion to suppress was held on September 3, 1965, and adjourned until December 16, 1966, at which time additional evidence was received. Transcripts of both hearings have now been filed of record. The thrust of defendant's argument on the motion to suppress is that he was not

adequately advised of his constitutional rights under the Fourth, Fifth and Sixth Amendments of the United States Constitution.

From the evidence, the following facts appear:

The defendant is forty-four years of age and a high school graduate, and has operated a gasoline station in Lehighton, Pennsylvania, since September, 1960. Defendant conducts the business himself and occasionally has part-time help. Under Section 4041(a) (1) of the Internal Revenue Code, defendant is required to file quarterly Retail Dealer's Excise Tax Returns on Government Form 720 for diesel fuel sold at retail, which form is forwarded to the taxpayer by the Internal Revenue Service approximately one month before the tax is due. Defendant filed his quarterly returns and made timely payment of his tax obligation for the quarterly periods from September, 1960, to September, 1962. Defendant did not file the quarterly returns and did not forward payment of the tax due for the quarterly periods ending December 31, 1962; March 31, 1963; June 30, 1963,.and September 30, 1963. On December 30, 1963, Internal Revenue Agent Carl Woelfel appeared at defendant's station, identified himself as being from the Internal Revenue Service, and informed defendant that he wanted to verify defendant's excise tax returns for the first three quarters of 1962. At that time, defendant told Agent Woelfel that he did not file returns or pay excise tax for the last quarter of 1962 and the first three quarters of 1963. In response to the Agent's inquiry as to the reason for this failure to file, defendant stated " * * * I didn't have the money as I was having financial trouble." Agent Woelfel reviewed some of defendant's daily records, but when it was ascertained that the bulk of defendant's records were not on the premises, defendant was asked to bring them to the premises for inspection at a later date. Agent Woelfel returned on January 6, 1964, at which time he examined defendant's records for several hours. Agent Woelfel submitted his findings and the information obtained to his Group Supervisor, who, in turn, discussed the investigation with the Chief of the Audit Division. The result of these discussions was that it was recommended that Agent Woelfel officially refer this case to the Intelligence Division for possible criminal prosecution. The referral form was executed by Agent Woelfel on January 17, 1964, in which he listed as reasons for the referral the fact that defendant did not file a return, that he did not have the money to pay the tax at that time, and that during the period defendant did not pay his federal excise tax, he had paid the Pennsylvania diesel fuel tax. The Intelligence Division accepted the referral and Special Agent William F. Glase was assigned to conduct the criminal investigation and Agent Woelfel was to assist him. At this point it should be noted that Agent Woelfel is a Revenue Agent and functions on the civil side of Internal Revenue Service investigations and it is his responsibility to conduct audits, assess civil liability and, in some instances, to collect delinquent taxes. If, during a civil investigation, the Revenue Agent suspects that a potential criminal violation may be involved, then he discusses his findings with his Group Supervisor and the Chief of the Audit Division and, if they approve, he formally refers the file to the Intelligence Division, which division conducts all criminal investigations and prosecutions. If the Intelligence Division agrees to accept a referral and embark on a criminal investigation, then a Special Agent assumes charge of the investigation and the Revenue Agent assists him.

In the latter part of January, 1964, Special Agent Glase assumed command of the investigation and met with Agent Woelfel and reviewed the file. By his own admission, he is authorized to make arrests and was searching for a violation of 26 U.S.C. § 7203. On March 16, 1964, Special Agent Glase and Agent Woelfel proceeded to defendant's place of business and Woelfel introduced Glase

as a Special Agent of the Intelligence Division. Glase displayed his credentials and informed defendant that " * * * he didn't have to answer any questions which I might ask him or he didn't have to show me any records or anything, and, if he did, his answers or the information he gave me could be used against him subsequently by the Government." It is conceded that this was the only warning given to the defendant throughout the entire investigation and at no time was he advised of any right to counsel or any right to confer with his lawyer. On March 16, both Agents checked and examined defendant's records and they returned on March 19, with photocopying equipment and were granted permission by defendant to photocopy some of his records. On May 1, 1964, the Agents returned and asked defendant if he would be willing to come to the Internal Revenue Service Office in Allentown to answer certain questions [1] and defendant agreed. On May 15, 1964, at the Internal Revenue Service Office in Allentown, in the presence of both Agents and a stenographer who was summoned from the Philadelphia Office, defendant was sworn and questioned at length concerning the investigation. As was hereinbefore noted, defendant was not advised of any constitutional rights at this Question and Answer Session. This indictment followed.

At the hearing, it was also established that prior to the May 15th session, the Agents had interviewed approximately twenty persons with whom defendant had business dealings; that the Agents checked to see if defendant's income tax returns were filed, and that prior to the referral to the Intelligence Division, Agent Woelfel ascertained the amount of taxes, interest and penalties owed by defendant and, at that point, could have collected the delinquency and closed the case.

Defendant argues most strenuously that when Special Agent Glase entered the picture, it had been clearly ascertained that defendant had not filed returns or paid the excise tax for the periods in question and that the investigation had focused on him as one accused of a criminal violation and that he should have been fully advised of his rights under the Fourth, Fifth and Sixth Amendments. The failure to so advise, according to defendant, deprived him of his rights under the United States Constitution and all evidence obtained thereafter must be suppressed.

The defendant having been advised on March 16, of his right to refuse to answer questions, the dispute appears to be twofold: (1) should defendant have been warned at some appropriate stage of the investigation of his right to counsel, and (2) should defendant have been warned once again of his right to refuse to answer on May 15, 1964, when a Question and Answer Session was conducted at the Allentown Office of the Internal Revenue Service?

After considering the evidence and arguments raised, I conclude that:

(1) there was no requirement that defendant be advised of his constitutional rights prior to March 16, when Special Agent Glase met defendant for the first time;

(2) defendant was properly advised of his constitutional rights under the Fourth and Fifth Amendments by Special Agent Glase on March 16;

(3) Special Agent Glase was not required to advise defendant of his right to counsel prior to the Question and Answer Session of May 15;

(4) under the circumstances of this case, Special Agent Glase should have advised defendant of his right to remain silent at the time of the Question and Answer Session of May 15, and further, at this point, defendant should have been advised of his right to counsel.

 Even though some evidence of criminal involvement had been made known to Revenue Agent Woelfel in his

---

1. Defendant was informed that " * * * we could talk better down there and wouldn't be bothered." N.T. 37, October 1, 1965.

civil audit of defendant's records, there was no constitutional or legal requirement that he informed defendant of any rights or contemplated course of action that might be taken. After Woelfel referred the case to the Intelligence Division there was no further personal contact with defendant until March 16, which was after Special Agent Glase assumed control of the investigation. Although a Special Agent is the police arm of the Internal Revenue Service and conducts inquiries for possible criminal violations,[2] the mere entry of such an agent into the case does not transform it from an investigatory status to an accusatory one. Upon Glase's first contact with defendant, he advised of defendant's right to refuse to answer questions or furnish records and that answers made or information given could be used against him at a future time. Glase was obligated to do no more. There was no requirement, at this point, that he inform defendant of any right to counsel. There is much to be said for the argument that the assistance of counsel is necessary during a tax investigation to protect Fourth and Fifth Amendment rights of the taxpayer, but the great weight of authority is to the contrary. A reading of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1963) and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965), indicates that the direct holding of those cases was limited to those instances where a defendant was actually in custody or deprived of freedom of action in any significant way:

> "Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.[4] * * *" Miranda v. State of Arizona (supra).

"4. This is what we meant in Escobedo when we spoke of an investigation which had focused on an accused."

Consequently, the events prior to May 15, survive constitutional scrutiny under the presently controlling case law. United States v. Burdick, 214 F.2d 768 (3d Cir. 1954); United States v. Frank, 245 F.2d 284 (3d Cir. 1957); United States v. Wheeler, 275 F.2d 94 (3d Cir. 1960); United States v. Fiore, 258 F. Supp. 435 (W.D.Pa.1966). See cases compiled in 76 Yale Law Journal 1 (1966). However, the events leading up to May 15, and the occurrence on that day cause me great concern. After observing defendant on the witness stand, I would say that he is hardworking, simple, unsophisticated, and one who would not possess much

2. The following Treasury regulations are taken from "Statement of Organization and Functions," Treasury Department Publication No. 383 (Rev. February 28, 1964):

"1118.6 *Intelligence Division. The Intelligence Division* enforces the criminal statutes applicable to income, estate, gift, employment, and *excise tax laws* (except those relating to alcohol, tobacco, narcotics and certain firearms), *by developing information concerning alleged criminal violations thereof,* evaluating allegations and indications of such violations to determine investigations to be undertaken, *investigating suspected criminal violations of such laws,* recommending prosecution when warranted, and measuring effectiveness of the investigation and prosecution processes. The Division assists other Intelligence offices in special inquiries, drives and compliance programs, and in the normal enforcement programs, including those combating organized wagering, racketeering, and other illegal activity, by providing investigative resources upon regional or National Office request. It also assists U. S. Attorneys and Regional Counsel in the processing of Intelligence cases, including the preparation for and trial of cases." (Emphasis supplied.)

knowledge of the workings of the Internal Revenue Service or of the significance of his constitutional and legal rights during the investigation. He had cooperated with the Agents, who, in the meantime, had checked to see if he had filed his income tax returns, had interviewed over twenty persons with whom he had done business, had determined that he had paid his Pennsylvania liquid fuel tax, and had assembled other evidence of a like nature, obviously in the development of a criminal case.[3] He was asked to travel to the Allentown Office on May 15 to answer some questions in an atmosphere where they "wouldn't be bothered", unlike the periodic business interruptions that would occur if they attempted to talk to defendant at his gas station. When defendant agreed to go to Allentown, Glase arranged for a stenographer to come in from Philadelphia on May 15, to transcribe the proceedings. Upon reporting on May 15, defendant was taken into a separate conference room in the presence of the two agents and the stenographer, asked to stand and was sworn, and then was subjected to a series of searching questions, to which he gave many incriminating answers. The extent of the questioning is revealed by a 50-page transcript taken that day. At no time on May 15, was he advised that he did not have to answer these questions, that he could remain silent, that anything he said could be used against him in a court of law, or that he could have the assistance of counsel.

■ To me, at this point, the posture of the investigation and defendant's role in it acquired new meaning. We must recognize that at some stage this investigation became criminally oriented and could no longer be considered a civil audit. I conclude that it had reached that stage in the Allentown hearing room on May 15, 1964. Defendant was an accused and any attempt *at this point* to distinguish a criminal tax investigation from any other federal criminal investigation where a crime is known to have been committed is a distinction without a difference. See United States v. Turzynski, 268 F.Supp. 847 (N.D.Ill. 1967). Defendant was as much an accused as any other suspected of violating a federal criminal law and was entitled to the same constitutional warnings.[4] True he had been told at the filling station that he need not answer questions, but now he was suddenly confronted with the solemnity and seclusion of a hearing room occupied by two governmental interrogators and a reporter. The door was closed and defendant was asked to stand and be sworn. It was then that the questioning began. Query: Under these circumstances, mindful of the surroundings, the capabilities of this defendant, the extent the investigation had reached, had he been effectively deprived of his freedom of action in any significant way so that he would feel compelled to answer the questions put to him? I believe so. Deprivation of freedom of action cannot be treated separately and in isolation, but must be evaluated in the light of what influence the atmosphere and surroundings of governmental oriented facilities had on the free choice of the person being interrogated. Miranda speaks of the failure of the officers at the outset of the interrogation to insure that the statements were truly the product of free choice and comments that unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be

---

3. As hereinbefore noted, the civil liability had long before been computed by Revenue Agent Woelfel.

4. See Miranda (supra) 384 U.S. p. 483, 86 S.Ct. 1602, where it is revealed that when an interview is conducted by agents of the Federal Bureau of Investigation, the standard warning given to both suspects and persons under arrest is that the person is not required to make a statement, that any statement may be used against him in court, that the individual may obtain the services of an attorney of his own choice, and that he has a right to free counsel if he is unable to pay.

the product of his free choice. The opinion in Miranda, at page 467, 86 S.Ct. at page 1624, states:

"Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons *in all settings in which their freedom of action is curtailed in any significant way* from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." (Emphasis supplied.)

To me, this was such a setting where defendant's freedom of action was curtailed in a significant way. As Miranda recognized, coercion can be mental as well as physical, and this must be considered in determining whether the setting in this case on May 15 curtailed defendant's freedom of action in any significant way so that he felt compelled to respond to the questions posed. Whether the test of coercion be a subjective one or determined by its effect on a man possessed of average resistance is not important here because coercion was present under either. test. See Consent Searches: A Reappraisal after Miranda v. Arizona, 67 Columbia Law Review 130, 145 (1967). Moreover, in such a setting, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel

present during any questioning, if the defendant so desires. Miranda v. State of Arizona (supra).

In addition, mindful of the civil audit powers bestowed on Internal Revenue Agents by federal law [5] and the inherent aura of authority associated therewith, fundamental fairness required Glase at the Question and Answer Session of May 15, to inform defendant, in understandable and explicit terms, that a criminal prosecution may be contemplated [6] and that defendant had the right to remain silent. Once again, I am influenced by my impression of this defendant and what must have been his personal sensation on that day. That defendant didn't realize his predicament is evident from the fact that after the hearing, he asked Glase " * * * to figure * * * up what I owed him, you know, so I could get them straightened out * * *." None of the reported cases I have read involved a one-sided encounter similar to the one before me. In none was there the inequality of position and relative imbalance as existed in this May 15th confrontation between defendant and Government Agents. As a result, I do not feel that they control here.

▪ Accordingly, I conclude that on May 15, defendant was not adequately advised of his constitutional rights to remain silent and to the assistance of counsel and, further, that the evidence procured on that day was obtained in violation of fundamental standards of fairness and did not represent a voluntary action on the part of this defendant. The evidence obtained during the Question and Answer Session will be suppressed.

---

5. Sections 7601–7606 of the Internal Revenue Code empower the Internal Revenue Service to examine records in determining the correctness of any return and to summon the person liable, as well as his records, relative to his tax liability.

6. "The cases assume that interrogation is relatively free as between government and taxpayer until some ill-defined zone is reached in which fairness requires the government to alert the defendant that

the theoretical risk of a criminal prosecution implicit in any investigation of an imperfect return has become a matter of pointed interest on the part of the government, whether or not the government has resolved to proceed. At some point the Government's further questions may become an attempt to take testimony in aid of prosecution rather than as part of an investigation." United States v. Carlson, 260 F.Supp. 423 (E.D.N.Y. 1966)

With reference to the motion to produce granted on August 27, 1965, in light of the evidence adduced at the hearings before this Court, the result reached on the motion to suppress, and, after an in camera inspection, the Order of August 27, 1965, will be vacated and the subpoenaed documents returned to the United States Attorney.